VICTOR MAXIMILLIAN JIMENEZ, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 18957

June 7, 1989                                    775 P.2d 694

*Moran & Weinstock,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

A jury convicted Victor Maximillian Jimenez of burglary,

robbery with use of a deadly weapon, and two counts of first degree murder. After a penalty hearing, the jury found that aggravating circumstances outweighed mitigating circumstances sufficiently to impose the death penalty. On appeal, Jimenez challenges the admissibility of some of the evidence, the sufficiency of the evidence, and the imposition of the death penalty.

## Facts

Jimenez and an acquaintance, Leandrew Domingo, went to Gabe's Bar on the evening of January 9, 1987. They drank until the bartender asked them to leave because Domingo kept falling asleep. Out of money, they went out the back door of the bar to where Richard Warner had parked his truck. Jimenez and Domingo broke into the cab of the truck by pushing in the wing window and took a transistor radio. They also opened a large tool box in the back of the truck and took from it a smaller tool box. Among the tools that Warner reported missing were carpet knives, sheetrock knives, a dagger, a sheetrock ax, and a drywall pouch. Jimenez took the tool box to his residence a short distance away and returned to Domingo with ten dollars.

The next morning the North Las Vegas Police were dispatched to Gabe's Bar. They found two bodies on the floor, victims of multiple stab wounds. One of the victims, John Mynheir, had been the bartender on duty, while the other victim, Antonio Velasquez, was a customer at the bar. Although no weapons were ever found, an expert testified at trial that the victims' wounds were consistent with wounds that could be inflicted by a carpet knife and a dagger. The investigation at the scene revealed bloody footprints made by tennis shoes and approximately $350.00 missing from the bar's slot bank and jukebox money.

On January 22, 1987, Detective Harry received information regarding the killings at Gabe's Bar. As a result of the information, he and Detective Scroggin went to Jimenez' residence. They advised Jimenez that they wanted to talk to him about a truck burglary, and Jimenez accompanied them to the police station. At the station, Jimenez was advised of his constitutional rights, but he invoked neither his right to remain silent nor his right to have an attorney. He then admitted to burglarizing the truck. He also stated that he had been in a fight outside the Guadalajara Bar (next to Gabe's Bar) the night of the killings. He claimed that someone had stabbed him in the toe and that he had thrown the tennis shoes away that he had been wearing.

The detectives then told Jimenez that they were investigating the murders at Gabe's Bar. Detective Harry asked Jimenez whether he or Domingo had been involved. Jimenez did not immediately respond, so Detective Harry repeated the question.

Jimenez responded, "Why, what happen to me if I did?" The detective said that it would depend on what happened. Jimenez asked if he would be executed, and the detective said that he could get the death penalty or life imprisonment.

Detective Harry asked him if he wanted to talk about it, and Jimenez was silent for a few seconds but then asked whether it would be easier on him if there had been two people involved. Again, the detective responded that it would depend on what happened. The detective temporarily ended the interview and went to Jimenez' residence where Jimenez' father gave the detective the tool box, which was later identified as Warner's, and some of Jimenez' clothes. Blood was identified on Jimenez' jacket and on a pair of pants by using a luminol test. The blood was later identified as human blood, but it could not be typed.

The detective readvised Jimenez of his rights and informed him that blood had been found on his clothing. Jimenez then responded, "Okay, you got me." He asked the detectives if they thought more than one person had done it, and Detective Harry said that they did not know. Jimenez asked, "What if I told you I did it myself?" And the detective asked him to tell them. Jimenez then said, "No, I can't. My family will be in danger." The interview then concluded.

On January 27, 1987, Jimenez' parents were contacted for the purpose of obtaining a statement. They agreed and went to the police station. They were interviewed for a short time and then they asked to see their son. They talked to their son for about thirty minutes, and the police then took formal statements from both parents. Mr. and Mrs. Jimenez both later testified that the police had told them they would be blamed for the murders if they did not answer the police's questions. However, the detectives denied that they had made any threats.

After Jimenez had spoken with his parents, Detective Scroggin went into the interview room with Jimenez. Jimenez was very quiet and subdued and appeared sad. The detective escorted Jimenez to the elevator to take him back to his cell. Jimenez' head was hung, and he began to cry. Detective Scroggin asked him what was wrong, and Jimenez replied that it just felt better to tell someone.

While Jimenez and Domingo were in custody in the North Las Vegas Jail, Jimenez told Domingo that he had bought the tool box for himself. Later, on their way to court, Jimenez said to Domingo that they were going to be locked up for a long time.

Billy Ray Thomas was incarcerated in the North Las Vegas Jail at the same time as Jimenez. Thomas was present in the cell block with Jimenez and several other inmates on January 28 when another inmate posed several questions to Jimenez. There was

some discussion regarding a jacket, and one of the inmates asked Jimenez if it was his jacket. Jimenez said that it was. Then the inmate asked Jimenez, if he did not kill the guy, how did blood get on the jacket. Jimenez did not answer. The inmate then asked why he did not get rid of it, and Jimenez said that he did not think about it at the time.

That same evening, a telephone was brought to the cell for inmate use. Jimenez used the phone for quite a while. Thomas wanted to use the phone, so he tapped Jimenez on the shoulder. Jimenez brushed him off and told him to wait. Thomas sat down next to Jimenez. Jimenez turned his body away from Thomas, dropped his head a little and covered his mouth. Thomas then heard Jimenez say, "They got me dad. I stabbed the guy."

### Admissibility of Evidence

Jimenez first argues that the trial court erred in allowing his mother to testify. Mrs. Jimenez, on two different occasions, repeatedly refused to testify concerning the events of which she had knowledge. The prosecutor called her to testify, and she testified concerning some inconsequential matters, then refused to go on. On the next day, defense counsel cross-examined her, and the prosecution again tried to get her to answer questions which she refused to do, except for some questions on further inconsequential matters. In the end, she gave very little testimony, and the court remanded her to custody for refusing to answer the prosecution's questions.

Jimenez claims he was prejudiced by Mrs. Jimenez' refusal to testify because of what the jury might have inferred from what Mrs. Jimenez did not say. We reject this argument as overly speculative. We also reject Jimenez' arguments that we should apply a parent/child privilege or that the court's failure to allow defense counsel to recross-examine Mrs. Jimenez violated Jimenez' right to confront and cross-examine.

Second, Jimenez claims that his admissions to the detectives and within the hearing of his cell mates should not have been admitted. He states that the testimony of Billy Ray Thomas and Leandrew Domingo concerning statements he made while in jail should have been excluded because he had already invoked his right to remain silent. This basis for excluding the testimony of Thomas and Domingo was not raised at trial and may not be raised now on appeal. Browning v. State, 104 Nev. 269, 757 P.2d 351 (1988); Geer v. State, 92 Nev. 221, 224, 548 P.2d 946, 947 (1976). Furthermore, even if we could consider it, Jimenez cannot show that Thomas and Domingo were acting as agents of the police in violation of the fifth amendment when they heard

Jimenez' admissions. *See* Thompson v. State, 105 Nev. 151, 771 P.2d 592 (1989); U.S. v. Malik, 680 F.2d 1162, 1165 (7th Cir. 1982).

Jimenez also made incriminating statements to Detectives Harry and Scroggin. He maintains that the credibility of the detectives is suspect because the statements were neither tape recorded nor transcribed.[1] The Alaska Supreme Court has imposed on the police a duty to record the statements of suspects whenever feasible. The penalty for not making the recording is suppression of the statements for violation of the due process clause of the Alaska Constitution. Stephan v. State, 711 P.2d 1156 (Alaska 1985). The Model Code of Pre-Arraignment Procedure, section 130.4, also requires that a defendant's statement must be recorded along with *Miranda* warnings and a warning that the statement is being taped.

While requiring recordings of statements would alleviate the problems of credibility of police officers who claim a defendant made incriminating statements, the concern is with the reliability of the testimony of the detectives, not with some unconstitutional action. Defense counsel elicited testimony at trial concerning the failure to tape record the interrogation and made the point to the jury that this failure served to call into question the reliability of the detectives' testimony. The jury then had the opportunity to decide on whether to believe the detectives. The jury's determination that the detectives' testimony was truthful is sufficient to quiet concerns of reliability. Thus, we decline Jimenez' invitation that we adopt a rule requiring the tape recording of defendants' statements.

### Sufficiency of the Evidence

Jimenez claims that there was insufficient evidence to support any of his convictions. "Where there is substantial evidence in the record to support the verdict of the jury, it will not be overturned by an appellate court." Williams v. State, 87 Nev. 230, 231, 484 P.2d 1088 (1971). To affirm, we must find sufficient facts from which reasonable inferences could be drawn to prove each element of the crime. *Id.*

First, Jimenez argues that holding one's hand over the bed of a truck cannot constitute entering under the burglary statute. *See* Smith v. District Court, 75 Nev. 526, 347 P.2d 526 (1959). While this is correct, Jimenez did more than just hold his hand

---

[1] Unlike his failure to move the court to suppress the testimony of Thomas and Domingo, defense counsel properly moved to suppress Jimenez' statements to the detectives.

over the bed of the truck. In addition to stealing the tool box from the bed of the truck, he broke into the cab and stole a radio.

Jimenez also contends that there was insufficient evidence that he was involved in the robbery and murders or that the robbery was committed in connection with the murders. In making this contention, Jimenez ignores the circumstantial evidence against him and, most notably, his own incriminating statements. The evidence showed human blood stains on Jimenez' clothing; his own incriminating remarks about being caught, stabbing someone and about going to jail for a long time; his absence from home during the time of the killings; the wound to his toe; his admitted burglary of the truck and access to carpentry knives; the fact that knives were missing from the tool box when it was recovered; the evidence that stab wounds to the victims were consistent with the type of knife missing from the tool box; and the money missing from the bar. The record contains substantial evidence of his guilt for all the convictions.

## Penalty

Two of the four aggravating circumstances found by the jury to exist in this case have no basis in fact. The first aggravating circumstance found by the jury was that the stabbing of these two victims with two different knives constituted the aggravated circumstance on the part of Jimenez of *knowingly* creating a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person. This aggravating circumstance contemplates the use of a weapon or device that, by its nature or the circumstances of its use, "would normally be hazardous to the lives of more than one person." NRS 200.033(3). Stabbing two persons with two different knives, even if Jimenez did both stabbings, does not make either knife a weapon or device that is *normally* dangerous to a multiplicity of persons. Finally, even if, conceivably, a knife could be used under circumstances that would endanger the lives of more than one person in a single course of action, such was not the case here. Jimenez, if acting alone, would have had to stab one victim and then turn his attention to stabbing another. Under such a scenario, even a rock could have been used to kill both victims and thus improperly claimed to constitute a basis for an aggravating circumstance under NRS 200.033(3). Our cases reflect the view that the employment of a weapon, device or course of action that is intrinsically hazardous to more than one life is a necessary predicate to a finding under NRS 200.033(3). Thus, in Moran v. State, 103 Nev. 138, 734 P.2d 712 (1987), we concluded that

firing a gun in an apartment with only the victim present, and no other persons known by the perpetrator to be in close proximity to the crime scene, did not constitute an aggravating circumstance under NRS 200.033(3). However, we also held in *Moran* that firing a gun at the victim with another person nearby did satisfy the requirements of the statute. Again, in Nevius v. State, 101 Nev. 238, 669 P.2d 1053 (1985), we upheld the invocation of NRS 200.033(3) when the defendant fired a shot at the victim with the victim's wife in the same room. However, the interpretation thus placed on the statute does not constitute support for a finding of an aggravating circumstance under NRS 200.033(3) in the instant case, and we so hold.

Another aggravating circumstance relied on by the jury is that the murder was committed by Jimenez to prevent a lawful arrest or to escape from custody. NRS 200.033(5). However, we have no evidence that these deeds were done with regard to arrest or escape of any kind.

The only arguably sustainable aggravating circumstances presented to the jury were that Jimenez acted with "depravity of mind" (NRS 200.033(8)) and that he committed the murders during a robbery (NRS 200.033(4)).

Since the jury considered and found that Jimenez knowingly created a great risk of death to more than one person and that he committed the murders to prevent a lawful arrest or to escape even though there was no basis in fact for finding these aggravating circumstances, the penalty phase was flawed by reversible error. It is therefore necessary to remand to the district court so that a jury can consider only aggravating circumstances that are grounded in fact and weigh those aggravating circumstances against the mitigating circumstances in a new penalty hearing.

### Conclusion

In addition to those issues we have already discussed, we also considered Jimenez' remaining assignments of error, and we find them to be without merit. Accordingly, we affirm all of the convictions against Jimenez and remand to the district court for a new penalty hearing.

YOUNG, C. J., STEFFEN, SPRINGER and ROSE, JJ., and BREEN, D. J.,[2] concur.

---

[2]The Honorable Bob Miller, Governor, designated the Honorable Peter I. Breen, District Judge of the Second Judicial District, to sit in this case in place of THE HONORABLE JOHN MOWBRAY, Justice, who voluntarily disqualified himself. Nev. Const., art. 6, § 4.