Springer, J.,
dissenting:
In my dissenting opinion to Canape v. State, 109 Nev. 864, 859 P.2d 1023 (1993), I expressed the view that a convicted first degree murderer becomes “death-eligible” at such time as a sentencer concludes, beyond a reasonable doubt, that there is at *961 least one aggravating circumstance associated with the murder and that mitigating circumstances do not outweigh aggravating circumstances. The principal issue in this appeal is whether Hogan is death eligible by reason of at least one aggravating circumstance’s having been proven beyond a reasonable doubt. The two aggravating circumstances which the State relies on are that Hogan had been previously convicted of a felony involving the use of violence and that his crime created a great risk of death to more than one person. Neither aggravating circumstance has been proved beyond a reasonable doubt.

Previous Conviction

Hogan pleaded guilty to manslaughter in Iowa in 1971. At the time of his manslaughter conviction, Iowa’s definition of the crime did not include a breakdown into the two forms of Common Law manslaughter: Voluntary Manslaughter and Involuntary Manslaughter. At Common Law, Voluntary Manslaughter entailed the intentional killing of a human being in the heat of passion. Involuntary manslaughter was an unintentional killing. A certified copy of Hogan’s 1971 Iowa “manslaughter” conviction does not tell the sentencer whether Hogan had intentionally or accidentally killed someone.
The record of this case reveals certain circumstances surrounding Hogan’s manslaughter guilty plea and conviction that were not made known to the sentencing jury. We know, for example, that Hogan’s guilty plea to “manslaughter” was accepted and that the conviction was entered in a manner that was violative of the United States Constitution. We also know that the State of Iowa stipulates[1] to the unconstitutionality of the voluntary/ involuntary manslaughter conviction.
If I am wrong in saying that Iowa’s stipulation that Hogan’s conviction is invalid should be conclusive on the point, then surely I am not wrong in saying that Hogan ought, at least, to have the right to have this issue adjudicated by the Nevada courts. It is not easy to predict how Nevada would be able to establish that Hogan’s conviction is valid, when Iowa, the venue of the conviction, says that it is not valid; still, it seems to me that, at *962 the very least, the prosecution in Nevada has the burden to prove beyond a reasonable doubt that the Iowa manslaughter conviction is not constitutionally objectionable.
To go on, even if the prosecuting attorneys in this case can in some manner show that the Iowa manslaughter conviction is valid and should be recognized by this state, the next question that presents itself is, “Conviction of what— intentional homicide or accidental homicide, voluntary manslaughter or involuntary manslaughter?” There is no way of knowing, at least from the authenticated copy of the judgment of conviction upon which the present prosecution relied, whether the conviction was for an intentional or unintentional homicide.[2]
The Nevada prosecuting attorney in this case, in proving this aggravating circumstance, simply relied on the Iowa record. As the prosecutor put it to the jury, “Now, you haven’t learned anything about the circumstances of that event, but you know a woman died. . . . Ladies and Gentlemen, the documentary evidence is before you. State’s Exhibits 100 and 101” (the authenticated copies of the Iowa conviction for “manslaughter”). I do not see how the mere introduction of this “documentary evidence” establishes beyond a reasonable doubt that Hogan is guilty of an intentional homicide.[3] The authenticated copy of an *963 Iowa “manslaughter” conviction, even a valid conviction, simply will not suffice to support a jury conclusion that Hogan was convicted of a felony that involved the use of violence.
The only aggravating circumstance that can possibly support a finding of death eligibility in this case is that Hogan created a “great risk” to the lives of others. Hogan deliberately killed one person and then deliberately tried to kill another. I suppose one could say that immediately before Hogan pulled the trigger, his victims were, in a manner of speaking, “at risk.” I do not believe that two, independent, deliberate consecutive killings comprise the kind of knowing creation of a “great risk of death to more than one person” that was contemplated by NRS 200.033(3). The gist of my position is that the isolated stabbing or shooting of a person, intentionally and deliberately, cannot constitute the required, conscious knowing that some person other than the immediate murder victim is at “great risk” unless other persons are in the immediate “zone of danger,” and the murderer knows at the time of the murder that he or she is placing others at great risk.[4]

*964
Knowingly Creating a Great Risk of Death of More Than One Person

The first point that I want to make is that this knowledge-of-the-risk aggravator above all requires knowledge on the part of the murderer — the murderer must know, must be aware, that at the time he is killing his victim, he is also, at the same time, placing some other person at great risk of death. It is the murderer’s indifference to the life of others that provides the rationale for this aggravating circumstance. If, for example, the murderer kills with a firearm, knowing that there is some one else in the line of fire or close to it, then the murderer may well be said to have murdered at a time when he was knowingly creating a great risk of death to another person.[5]
What I am saying about the nature of this aggravator is exampled in our Jimenez case, cited in the Majority. 105 Nev. 337, 775 P.2d 694 (1989). In Jimenez, as here, there were consecutive, homicidal events. In Jimenez, however, we held that consecutive stabbings did not fulfill the requirements of this aggravator, noting that, “Jimenez, if acting alone, would have had to stab one victim and then turn his attention to stabbing another.” Id. at 342, 775 P.2d at 697. In the case now before us, Hogan “had to [shoot] one victim and then turn his attention to [shooting] another.” “[T]he employment of a weapon, device or course of action that is intrinsically hazardous to more than one life is a necessary predicate to a finding under NRS 200.033(3).” Id. at 342, 775 P.2d at 697. Neither consecutive, intentional stabbings nor consecutive, intentional shootings are “intrinsically dangerous to more than one person.”[6] The “necessary predicate” is not present in Hogan’s case.
*965 Although I am not sure, it seems that the Majority is saying that killing one person and then trying to kill another is a “course of conduct” that is, to use the language in Jimenez, “intrinsically hazardous.” At the time Hogan shot and killed his woman friend, the second victim was not present, and Hogan could not possibly have been “knowingly,” creating any hazard to her. At the time Hogan murdered, he was not doing something that was “intrinsically hazardous” or that “would normally be hazardous” to others. For the aggravator to relate to Hogan, Hogan must have known that in the act of shooting his woman friend, his actions were “normally” or “intrinsically”[7] dangerous to the second victim. Hogan, very simply, cannot be said to have known at the time he shot his woman friend that he was, by shooting her, creating a “great risk of death” to another person whose whereabouts was not even known to him at the time.
The Majority gives us a very good example of “intrinsically hazardous” conduct when it cites the Stoyko case. In Stoyko, the murderer rammed a car occupied by the victim and others and then, knowing that there were persons other than the victim in the car, discharged a shotgun into the interior of the car — a perfect example of knowingly creating a great risk of death to more than one person. Com v. Stoyko, 475 A.2d 714 (Pa. 1984). Such conduct is intrinsically hazardous, because it is by its very nature dangerous to others. If, for example, Hogan had shot at his murder victim at the time when his victim’s daughter was in the line of fire or at least in the same room, a case might be made for knowingly creating a great risk if it could be shown that Hogan had known of the other’s presence and had acted heedlessly. This is not the case here, however. There is nothing intrinsically or essentially dangerous to more than one person that characterizes Hogan’s shooting one and, later, another person.[8]
*966 The legislature could, of course, widen the aggravating circumstance noose by creating a new and different aggravator that made successive killings of two or more people within a certain interval of time constitute an aggravating circumstance. See note 6 supra. As the law now stands, however, under NRS 200.033(3), killing one person and later killing or trying to kill another is not an aggravated murder.
We must remember that the essence of all of these aggravating circumstances is increased culpability. A person who in the process of committing a murder shows an utter disregard of human life, and “knowingly creat[es] a great risk of death” to persons other than his immediate victim, is certainly more culpable than a person who kills one person and then, subsequently, tries to kill another. This kind of culpability is not present in Hogan’s case. Hogan cannot be executed on the basis of this statutory aggravating circumstance.

Law of the Case

All I have to say on this point is that if neither aggravating circumstance can possibly exist under the facts of this case, then past adjudications by this or by other courts, whether right or wrong at the time, should not be permitted to be the direct and proximate cause of this man’s execution.

Iowa stipulates that Hogan’s plea to “manslaughter” violated Iowa law because of the lack of adequate assistance of counsel and because of a violation of the Boykin requirements applicable to the pleas. See State v. Sisco, 169 N.W.2d 542 (1969) (Iowa’s adoption of the Boykin rules). The Majority appears to be saying that it is not enough for the State of Iowa to admit that the conviction is infirm; the Majority insists on an adjudication of the conviction’s invalidity and appears to be saying that because Hogan did not timely raise the issue in the Iowa courts, he will not be permitted to raise the unconstitutionality of his conviction as he now attempts to save his life.

At the penalty stage hearing, the Nevada prosecution introduced an authenticated copy of an Iowa conviction for manslaughter. The problem is that in 1971 the Iowa manslaughter statute did not distinguish between voluntary and involuntary manslaughter, between violent and nonviolent manslaughter. In 1971, manslaughter was defined in the Iowa criminal code, Section 690.10, as follows: “Any person guilty of the crime of manslaughter shall be imprisoned in the penitentiary not exceeding eight years, and fined not exceeding one thousand dollars.” The statute did not distinguish between voluntary manslaughter, which is an intentional, “violent” killing, and involuntary manslaughter, which in Iowa might have been a homicide in which a person “by accident kills another.” See State v. Abarr, 39 Iowa 185 (1874). Voluntary manslaughter did not become a statutory crime until 1981, after Hogan’s conviction. Section 707.4 of the Iowa criminal code now defines “voluntary manslaughter” in common law terms and provides that this crime is committed “under circumstances which would otherwise be murder,” and goes on to mitigate the crime in cases of “irresistible passion” and “serious provocation.” “Voluntary manslaughter” is not the crime relied on as an aggravator in this case. In 1971, when Hogan entered his constitutionally objectionable guilty plea to “manslaughter,” the statute did not, as said, divide the crime into voluntary and involuntary manslaughter. In 1971, “manslaughter” was a crime that might or might not have involved the intentional killing by the use of force or violence.

The Majority puts great stock in statements made by Hogan’s attorney in proceedings held in Iowa in January 1971. The Iowa homicide involved a motor vehicle. Hogan’s attorney speculated on his “theory of the fracture which resulted from the blow on the car [sic] as the cause of death.” Hogan’s attorney expressed his opinion that “this [‘blow on the car’] was the cause of *963 the death.” The attorney, not Hogan, commented that Hogan “struck her head against the car, and on our advice he has entered a plea of guilty thereon.” I probably should not quibble about the meaning of the statement by Hogan’s lawyer that Hogan, whether accidentally or intentionally, “struck her head against the car,” because this dialogue with the Iowa court was not part of the death penalty hearing in this case; but it seems to me that even if this statement had been introduced into the Nevada proceedings, it is subject to contradiction and explanation. The bald fact that Hogan “struck her head against the car” does not, of itself, clarify the application of the undifferentiated Iowa “manslaughter” statute and does not establish beyond a reasonable doubt that Hogan committed the crime of voluntary manslaughter. This is particularly true because there is no mention of the essential elements of a voluntary manslaughter conviction, adequate provocation and killing in the heat of passion. Even if the Nevada courts were to accept the Iowa manslaughter conviction, Hogan ought to have an opportunity to show, if that is his position, that his manslaughter conviction was not for voluntary manslaughter but, rather, for an unintentional killing and that unintentional, accidental homicide is not the type of felony contemplated by our “use of violence” aggravator. As matters now stand, even if we were to accept the “manslaughter” conviction as being constitutionally acceptable, the question of whether Hogan’s Iowa conviction was for voluntary or involuntary manslaughter is necessarily a matter of conjecture and not the type of evidence upon which a death penalty judgment can be properly based.

In Hogan v. State, 103 Nev. 21, 23, 732 P.2d 422 (1987) (“Hogan I”), we incorrectly held that two, consecutive “intentional” shootings, closely related in time and place, could fulfill the requirements of NRS 200.033(3), because consecutive murder constituted a “course of conduct” that created a great risk of death to more than one person. I now understand (as I should have when I signed Hogan I) that when a murderer shoots and kills one person and then goes on later to shoot a second person, the murderer cannot be guilty of the knowledge-of-risk aggravator unless, at the time he shoots *964 the first person, he knows that by his action in shooting the first person, he is, at the same time, creating some risk of death to the second person. This court recognized this rather obvious reality when it decided Jimenez v. State, 105 Nev. 337, 775 P.2d 694 (1989). The only difference between the case currently before the court and Jimenez is that Jimenez involves consecutive stabbings, whereas, the present case involves consecutive shootings. The Majority opinion and Jimenez are irreconcilable. Jimenez overruled Hogan I insofar as Hogan I might have stood for the proposition that a first shooting necessarily involves knowing risk exposure to a second victim, even if the consecutive shootings are “closely related in time and place,” (unless, of course, the murderer knows that when he shoots the first victim, he is putting victim number two at “great risk of death”).

I would comment here that in the stated example the person who was intentionally killed was not really at any risk — certainly not at risk in the mind of the murderer who killed intentionally and not through any risk-taking activity. A more carefully worded statute would read, “knowingly creating great risk of death to any person other than the victim of the murder being charged.”

The legislature might, in the future, try to construct some other form of aggravating circumstance that would be comprised of serial or consecutive *965 killings or attempted killings and probably would not involve the mental element of “knowingly” creating risk. It would be difficult in drafting such a statute to define just how many consecutive killings would have to take place and during what specified duration of time they must be perpetrated.

I may be belaboring this point, because, it is so clear that Hogan could not possibly have known of any danger to his woman friend’s daughter at the time of the first shooting because, at that time, the daughter was not in danger. Unless the person-at-risk is in a “zone of danger” of which the convicted murderer was aware, this aggravator cannot be present. Some things are intrinsically dangerous, such as a bomb. A “course of conduct” might be intrinsically hazardous, such as firing an automatic weapon into a crowd at a football game. Such acts are intrinsically dangerous to persons other than the intended victim because by their nature they are dangerous to others. If a person were to decide to kill another by burning down a motel, such an act would be “intrinsically hazardous” to more than one person. An isolated shooting or stabbing cannot possibly be called “intrinsically hazardous to more than one life.”

The English case, cited in the Majority opinion, mistakenly invokes this Wife-based aggravator in a non-risk case. Note that in English, the court *966 acknowledged that “that defendant intended to commit each murder by a distinct act, that is, by shooting each intended victim individually at short range.” State v. English, 367 So.2d 816, 824 (La. 1979) (emphasis added). Such circumstances might fulfill the requirements of some hypothetical, “multiple murder” aggravator, but it certainly cannot be the predicate for a knowing, great-n'sk-of-death-to-more-than-one-person aggravator, because definitionally, “knowing” or subjective risk-taking is inconsistent with the doing of intentional harm. When I intend to harm someone, it is idle to say that I am creating a “risk” of harm to that person.