*1412 OPINION
By the Court,
Rose, J.:
In 1984, appellants Dale Flanagan and Randolph Moore murdered Flanagan’s grandparents. Flanagan and Moore were convicted of the murders and sentenced to death. This court affirmed appellants’ convictions on appeal, but remanded for a new penalty hearing due to prosecutorial misconduct. This court affirmed the death sentences appellants received after the second penalty hearing. However, the United States Supreme Court vacated that decision and remanded for reconsideration due to evidence presented at the second hearing regarding appellants’ occult beliefs and activities. Upon remand, this court held that use of such evidence had been unconstitutional, and we remanded for a third penalty hearing. After the third hearing, appellants again received death sentences.
Flanagan and Moore appealed. They argue that their convictions should be reversed because the same type of constitutional error occurred at the guilt phase of their trial as occurred at the second penalty hearing. They also seek reversal of their sentences on a number of grounds.

FACTS

This case involves the shooting deaths of Flanagan’s grandparents, Carl and Colleen Gordon. The Gordons were found dead on November 6, 1984, Carl having been shot seven times in the back and chest and Colleen having been shot three times in the head. On direct appeal, we found overwhelming evidence that Flanagan, Moore and four other co-defendants killed the Gordons so that Flanagan could obtain insurance proceeds and an inheritance under his grandparents’ will.
Flanagan v. State, 107 Nev. 243, 245, 810 P.2d 759, 760 (1991) (Flanagan II), vacated, 503 U.S. 930, 931 (1992).
Appellants were tried in September and October 1985 along with two other co-defendants, Johnny Ray Luckett and Roy McDowell. (Two others charged in the matter pled guilty.) Luckett’s lawyer called Wayne Wittig to testify in Luckett’s defense. The district court allowed in the following testimony over objection by Moore’s and Flanagan’s lawyers:
Q Now, was there a point in time in your relationship with Dale [Flanagan] and Randy [Moore] that the three of you along with other people participated in what is known as a coven?
*1413 A Yes, that is correct.
Q Would you please tell us what a coven is?
A A coven basically is gathering of people to use, you might say, its basis of Satan to get the most out of life, so to speak. Being able to have help when you need it. You know, somebody to kind of call upon if something should ever arise.
Q Now, is this practice divided into at least two categories, one of which is black magic and the other of which is white magic?
A Well, I can’t say for all, but I can say for the one I was involved in, there was two different kinds, yes.
Q And would you tell us, at least insofar as your coven at that time was concerned, what black magic was, what was the purpose of this?
A Well, black magic basically was used to if somebody was in danger in any way, you could more or less put a hex on them and they would feel pain that they wouldn’t normally feel.
Or psychological effects, you know, more or less just “Ow, my arm hurts,” continuous arm hurt. Or just all of a sudden you start feeling weird for some reason and you can’t explain it.
Q What was white magic?
A White magic was the ability to manipulate people to do things they wouldn’t normally otherwise do. Say you are walking down a corridor and for some reason you never walk through the door on the right. Well, this could give you the ability to walk through that door.
Q Was this just a lighthearted party atmosphere or was it more serious for the people that were involved in it?
A In some instances it was serious. There were a couple of occasions where a fellow friend would have some problems, say, at school or something with somebody else.
And it was more like just, you know, I am going to get you sort of thing and just kind of use it for defense more or less.
Q What was the role of Dale Flanagan in the coven activities which you personally participated in?
A Dale was basically — I don’t know if the correct word is wizard but he was basically the second in command as far as the coven went. He had actually the first — most power, but there was one power more stronger than his.
Q What type of magic did he practice or engage in?
*1414 A Black magic.
Q And what was the role of Randy Moore?
A He was, like I said, basically first in command. He had the white magic which was the power to manipulate people.
Q Would it be fair to say he was the leader of the group?
A Yes.
Luckett introduced this evidence to support a defense theory that any involvement he had with the crimes was due to fear of Flanagan and Moore.
Moore’s lawyer cross-examined Wittig as follows:
Q Now, you testified about covens and covens which you attended and you told us that Dale and Randy were at these covens. About how many did you attend? Your best recollection. I am not asking for an exact number.
A Probably somewhere between zero and 20 or between, say, one and 20, excuse me.
Q And during these covens that you attended anywhere from one to 20, was there conversation as among the people in attendance?
A Pertaining to?
Q Was there conversation, yes or no?
A Yes.
Q Was it in the nature of social conversation?
A Sometimes.
Q And did any of the people in attendance at these covens do anything that you would consider to be antisocial?
A No.
Q Didn’t burn or kill any cats?
A No.
Q Didn’t set any places afire?
A No.
Q The prior sessions, tell us what went on these sessions you did attend, one to 20?
A More or less psychological. Linked thought, things like that.
Q Okay. But nothing antisocial?
A We didn’t run around going “Satan, rah, rah, rah,” things like that.
Q You didn’t go skinning cats, burning lawns or firing crosses or carving things into?
A No, sir.
Q Whatever strange things one would imagine might be done in this sort of thing?
A No. They were peaceful.
*1415 Q Peaceful, social?
A Yes.
Q There was communication among the people present?
A Yes.
Q Nobody was forced to attend?
A No.
Q And nothing was antisocial about those meetings at all?
A No.
One of the two prosecutors cross-examined Wittig regarding a knife which was found near the murder scene and elicited information regarding coven initiations which involved passing a knife blade through a flame.
No other evidence of occult activities was presented. The prosecutor who gave the State’s initial closing argument made the following remarks:
[The four defendants] had as their friends gang members. These people were school dropouts. They were drug users. They were devil worshippers.
And on November the 5th, 1984, as Carl and Colleen Gordon were indeed going to bed, these four and others were hatching a diabolical plot, a diabolical plot to kill two good human beings ....
They didn’t ask their grandson Dale to come to them and kill them so they could give him and his devil-worshipping buddies a piece of their estate a little more quickly.
. . . [Flanagan] was going to share [what he thought he would gain from the murders] with all of his friends. Probably divvy it up in the middle of a coven proceeding or something.
That’s the agreement. That’s the conspiracy. That’s the dark and evil plan that was created over a period of time and put into action and finalized on that fateful night.
[Flanagan and Moore] were, in fact, the main co-conspirators. They were the talkers, they were the planners. They led this thing. They didn’t only lead the coven, they let their black and their white magic spill over into this conspiracy ....
The prosecutor made further references to devil worship in attacking Luckett’s credibility. In the State’s final closing argument, a second prosecutor stated: “And then Mr. Luckett through his attorney decided to project this notion of white and black *1416 magic into the case. I don’t know that it has any relevance but it was projected into this case for a reason.”
The jury found Flanagan and Moore guilty of seven crimes: conspiracy to commit burglary, conspiracy to commit robbery, conspiracy to commit murder, burglary, robbery, and two counts of first degree murder with use of a deadly weapon. The jury also returned sentences of death for both men.
Flanagan and Moore appealed. This court acknowledged that prosecutorial misconduct had occurred during the guilt phase of the trial, but concluded that “the prosecutor’s actions were not so prejudicial as to mandate reversal” in light of the overwhelming evidence of guilt. Flanagan v. State, 104 Nev. 105, 107, 754 P.2d 836, 837 (1988) (Flanagan I). However, extensive misconduct rendered Flanagan’s sentencing unfair, and this court remanded for a new penalty hearing. Id. at 112, 754 P.2d at 840. Moore also received a new penalty hearing for the same reasons. Moore v. State, 104 Nev. 113, 114, 754 P.2d 841, 841 (1988).
Upon remand, appellants again received death sentences. They appealed, and this court upheld the sentences. Flanagan II, 107 Nev. at 250, 810 P.2d at 763. The United States Supreme Court vacated this court’s decision and remanded for reconsideration in light of Dawson v. Delaware, 503 U.S. 159 (1992). Flanagan v. State, 109 Nev. 50, 52, 846 P.2d 1053, 1055 (1993) (Flanagan III) (plurality opinion). In Flanagan III, this court remanded for a third penalty hearing. Id.
In May 1995, Moore and Flanagan filed habeas petitions with the district court, seeking to overturn their convictions. They contended that the evidence introduced and the arguments made regarding covens and devil worship during the guilt phase of their trial violated Dawson and Flanagan III. The district court heard argument and denied the petitions. Appellants appealed these denials. Appellants also moved to strike their death sentences on the basis that they could not receive a fair penalty hearing after ten years in prison. The district court denied these motions at the same hearing that it denied the habeas petitions.
A third penalty hearing occurred in June 1995. The jury imposed two death sentences on each appellant for the two murders, finding the same mitigating and aggravating circumstances for each appellant for each crime. The three mitigating circumstances were: the defendant had no significant history of prior criminal activity, the youth of the defendant at the time of the crime, and “[a]ny other mitigating circumstances.” The four aggravating circumstances were: the defendants knowingly created a great risk of death to more than one person, the murders were committed while the defendants were engaged in the commission of or an attempt to commit or flight after committing or *1417 attempting to commit a robbery, the murders were committed while the defendants were engaged in the commission of or an attempt to commit or flight after committing or attempting to commit a burglary, and the defendants committed the murders to receive money or any other thing of monetary value. Appellants filed appeals of their judgments of conviction. On September 26, 1995, this court ordered joint review of those appeals and the appeal of the denial of habeas relief.

DISCUSSION

Whether appellants ’ convictions should be reversed because the State violated appellants ’ First Amendment protections during the guilt phase of the trial

Appellants asserted in their habeas petitions below that the State violated their First Amendment protections during the guilt phase of the trial by arguing that appellants were involved in devil worship. The district court denied the petitions.
The Supreme Court has held that the First Amendment prevents a state “from employing evidence of a defendant’s abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried.” Dawson v. Delaware, 503 U.S. 159, 168 (1992). In Dawson, the appellant belonged to a white racist prison gang, and the prosecution introduced this evidence at his sentencing for murder. The evidence, however, had no apparent relevance to the sentencing proceeding: it was not tied in any way to the murder, it did not serve to show that the appellant was a future danger to society, nor was it used to rebut any mitigating evidence. Id. at 166-67. The Supreme Court concluded that the evidence was not relevant character evidence because it “was employed simply because the jury would find these beliefs morally reprehensible.” Id. at 167.
At the second penalty hearing in the instant case, the State presented evidence that Moore and Flanagan held beliefs in the occult and participated in coven activities. Flanagan III, 109 Nev. at 52, 846 P.2d at 1055. The United States Supreme Court vacated this court’s decision affirming the sentences imposed at that hearing and remanded for reconsideration in light of Dawson. Upon remand, this court derived the following rule from Dawson: “Evidence of a constitutionally protected activity is admissible only if it is used for something more than general character evidence.” Id. at 53, 846 P.2d at 1056. The court stated:
*1418 The prosecution presented evidence that appellants believed that they controlled “white magic” and “black magic,” that they controlled other supernatural powers, and that they worshipped the devil. Although these beliefs are offensive to many, they are clearly religious within the broad scope of the First Amendment.
Id. at 54, 846 P.2d at 1057. The court concluded that “as in Dawson, the prosecution failed to link cult participation or beliefs with appellants’ crimes.” Id. at 55, 846 P.2d at 1057.
As in the second sentencing hearing, the State’s closing argument during the guilt phase of the trial also violated appellants’ First Amendment rights under Dawson.[1] The evidence was irrelevant to the crimes charged, and the prosecutor improperly used it in the guilt phase simply to demonstrate the appellants’ bad character. He implied that devil worship was somehow linked to the crimes, asserting that Flanagan and Moore “let their black and their white magic spill over into this conspiracy,” but he never presented evidence of such a link.
However, we conclude that this error does not require automatic reversal. We decided in Flanagan III that under Zant v. Stephens, 462 U.S. 862 (1983), “due process of law requires that the jury’s decision to impose death be set aside. This requirement leaves no room for a harmless-error analysis.” Flanagan III, 109 Nev. at 57, 846 P.2d at 1058. In regard to death sentencings, we reaffirm this holding in Flanagan III, but we decline to apply it in cases where a Dawson violation has occurred in the guilt phase of a trial.
A majority of the United States Supreme Court has indicated that harmless-error analysis of Dawson errors is permissible. In Dawson, the Court stated: “The question whether the wrongful admission of the Aryan Brotherhood evidence at sentencing was harmless error is not before us at this time, and we therefore leave it open for consideration by the Supreme Court of Delaware on remand.” Dawson, 503 U.S. at 168-69. In Pope v. Illinois, 481 U.S. 497, 504 (1987), the Court vacated a state court judgment and remanded a criminal obscenity case to the state court to determine whether a jury instruction which violated the First Amendment was harmless error. The Court saw “no reason *1419 to require a retrial if it can be said beyond a reasonable doubt that the jury’s verdict in this case was not affected by the erroneous instruction.” Id. at 502.
In his concurrence in Dawson, Justice Blackmun suggested that harmless-error review of an error violating First Amendment protections was not appropriate “[b]ecause of the potential chilling effect that consideration of First Amendment activity at sentencing might have.” Dawson, 503 U.S. at 169 (Blackmun, J., concurring). In Flanagan III, we in effect followed Justice Blackmun’s suggestion in regard to capital sentencings. Of course, admission of irrelevant evidence of constitutionally protected First Amendment activities is also erroneous during a trial’s guilt phase, but in light of Pope and the majority opinion in Dawson, we conclude that such error does not and should not require automatic reversal. The character of the defendant is usually a relevant, in fact a primary, issue during the sentencing phase, and there is a tremendous risk that improperly admitted character evidence will influence a jury in setting a punishment for a convicted defendant. This risk is unacceptably high when the defendant has been convicted of murder and faces the death penalty. See Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion) (there is a heightened need for reliability in the determination that death is the appropriate punishment in a case). On the other hand, we believe that a jury may not be influenced by improper character evidence during the guilt phase, where a defendant’s character is not relevant except in expressly restricted circumstances, and therefore conclude that harmless-error review of guilt-phase Dawson errors is appropriate.
This does not mean that the State has an easy task to establish harmless error and avoid reversal in such cases. The harmless-error rule places the burden on the State to demonstrate beyond a reasonable doubt that any error was harmless, i.e., that it did not contribute to the verdict. Chapman v. California, 386 U.S. 18, 24 (1967).
In this case, as noted above, the evidence regarding appellants’ involvement with the occult was introduced by their co-defendant, Luckett. Admission of this evidence was not error because it was relevant to Luckett’s defense theory, but the prosecutor’s closing remarks were error because he employed the evidence simply as character evidence. We are unconvinced, however, that the jury gave these remarks much significance above and beyond the evidence of occult involvement that was properly received into evidence. The only evidentiary basis for the remarks was unimpressive testimony by one witness, a *1420 “coven” participant, regarding meetings where adolescent males indulged in fantasies of magical power and importance. The witness gave no evidence of any kind of violence or planned violence at these meetings, and his evidence offered little support for the first prosecutor’s references to “devil worship” and none for finding that involvement in the occult led to the murders. In fact, the jury heard the second prosecutor question whether the subject of white and black magic even had any relevance to the case. Furthermore, the jury was instructed that “[sjtatements, arguments and opinions of counsel are not evidence in the case,” that it was “to consider only the evidence in the case in reaching a verdict,” and that “whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be and by the law as given you.” The jury was also aware of the self-serving nature of Luckett’s evidence of occult activities and his claim that he was compelled to commit the crimes. The jury apparently looked on this evidence with skepticism or found it of little or no importance, convicting Luckett along with appellants and the fourth defendant.
We characterized the evidence against Flanagan and Moore as “overwhelming” in our first opinion in this case. There is no reason to change that characterization now, nor has either appellant disputed the weight of the evidence against him. The evidence included eyewitness testimony regarding meetings held prior to the murders where appellants planned to kill the Gordons and statements made after the murders in which Flanagan admitted to killing his grandmother, Mrs. Gordon, and Moore admitted to killing Mr. Gordon. We conclude beyond a reasonable doubt that the jury looked to this evidence in convicting appellants and that the prosecutor’s improper remarks did not contribute to the verdict.

Whether sufficient evidence existed to sustain the aggravating circumstance of creating great risk of death to more than one person

Pursuant to NRS 200.033(3), the State alleged and the jury found the aggravating circumstance that in committing the murders, appellants “knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person.” Appellants contend that there was insufficient evidence to find this circumstance.
Appellants cite Jimenez v. State, 105 Nev. 337, 775 P.2d 694 (1989), where this court determined there was no factual basis for *1421 finding creation of a great risk of death to more than one person. However, the murder weapons in Jimenez were knives, and the court concluded: “Stabbing two persons with two different knives, even if Jimenez did both stabbings, does not make either knife a weapon or device that is normally dangerous to a multiplicity of persons.” Id. at 342, 775 P.2d at 697. Appellants also cite Moran v. State, 103 Nev. 138, 734 P.2d 712 (1987). However, in Moran no other persons were present in the apartment when Moran shot the victim, and there was no evidence that any neighbor was at an immediate risk of death or that Moran knew of any other person in close proximity. Id. at 142, 734 P.2d at 714.
In the case at bar, Flanagan shot his grandmother knowing that his grandfather was upstairs, and Moore shot the grandfather as he came downstairs. They planned to kill both grandparents. This court held in Hogan v. State, 103 Nev. 21, 24-25, 732 P.2d 422, 424 (1987) (Hogan I), that NRS 200.033(3) “includes a ‘course of action’ consisting of two intentional shootings closely related in time and place . . . .” See also Hogan v. Warden, 109 Nev. 952, 959, 860 P.2d 710, 715 (1993) (Hogan II) (“Obviously, one who intends to commit multiple murders within a closely related time and place engages in a course of conduct inherently hazardous to the life of more than one person.”).
Appellants point out that in 1993 the Legislature added the aggravating circumstance of conviction, in the immediate proceeding, of more than one offense of murder in the first or second degree. NRS 200.033(12); 1993 Nev. Stat., ch. 44, § 1 at 77. This amendment does not apply to murders committed before October 1, 1993. 1993 Nev. Stat., ch. 44, § 2 at 77. Appellants contend that this shows that the Legislature did not intend to include cases such as theirs, where only intended victims were murdered, within the ambit of NRS 200.033(3), undermining the holding in Hogan I and Hogan II.
However, we conclude that under Hogan I the aggravator in question was valid in appellants’ case. The legislative amendment apparently requires that for murders committed after October 1, 1993, the aggravator set forth in NRS 200.033(12), rather than the one in NRS 200.033(3), be applied to cases such as this one. But this does not mean that NRS 200.033(3) was improperly applied to appellants’ case, where the murders occurred in 1984. We conclude that substantial evidence existed to support the finding that appellants knowingly created a great risk of death to more than one person by means of a weapon and course of action which would normally be hazardous to the lives of more than one person.
*1422 Claims previously rejected
The district court denied appellants' motion to exclude evidence of their co-defendants' sentences from the third penalty hearing. The prosecutor informed the jury of the sentences received by the four other individuals involved in the murders. In closing argument, the prosecutor argued that in view of the other four individuals' involvement in the crimes and their sentences, appellants deserved the death penalty. Appellants contend that this evidence and argument was improper, but this court has already rejected this contention, concluding that "it was proper and helpfiil for the jury to consider the punishments imposed on the co-defendants." Flanagan II, 107 Nev. at 248, 810 P.2d at 762. Under the doctrine of the law of the case, we decline to revisit this issue. Hall v. State, 91 Nev. 314, 315-16, 535 P.2d 797, 799 (1975).
Rejecting an alternative instruction offered by appellants, the district court instructed the jury: "A verdict may never be influenced by sympathy, prejudice or public opinion." The jury was also instructed that murder of the first degree could be mitigated by three enumerated circumstances and "[a] ny other mitigating circumstances." Appellants argue that precluding the jury from considering sympathy violated the constitutional requirement that a jury consider all mitigating evidence. This court has already rejected appellants' argument and upheld the antisympathy instruction, holding that "because the penalty jury was properly instructed to consider any mitigating circumstances, the district court did not err in instructing the jury that it should not be influenced by sympathy, prejudice or public opinion." Flanagan II, 107 Nev. at 248, 810 P.2d at 762. Again, under the doctrine of the law of the case, we decline to revisit this issue. Hall, 91 Nev. at 3 15-16, 535 P.2d at 799.
Other assignments of error
Flanagan claims that the jury was inadequately instructed regarding the elements of burglary, robbery, escape, and attempt. However, he did not request such instruction when jury instructions were settled. The failure to request special instruction to the jury precludes appellate consideration of the issue. Etcheverry v. State, 107 Nev. 782, 784, 821 P.2d 350, 351 (1991). We see no merit to Flanagan's argument anyway. He does not contend that robbery and burglary did not occur, nor does he demonstrate how the failure to define attempt or flight may have led to an incorrect *1423 verdict. We conclude that the district court did not err and that no prejudice resulted from the lack of instruction on these matters.
Appellants also argue that the district court provided an erroneous jury instruction on parole and possible modification of sentences. However, they did not object to the instruction. Failure to object or to request an instruction precludes appellate review, unless the error is patently prejudicial and requires the court to act sua sponte to protect a defendant’s right to a fair trial. Ross v. State, 106 Nev. 924, 928, 803 P.2d 1104, 1106 (1990). No patently prejudicial error occurred here since the instruction given is prescribed by Petrocelli v. State, 101 Nev. 46, 56, 692 P.2d 503, 511 (1985).[2]
Appellants contend that a number of other errors occurred: that their appeal from denial of their habeas petitions divested the district court of jurisdiction to conduct the penalty hearing; that improper evidence of witness intimidation was admitted; that they could not receive a fair penalty hearing after ten years in prison; that lengthy confinement before imposition of the death penalty in this case is cruel and unusual punishment; and that insufficient evidence existed to sustain the aggravating circumstances of committing murder while engaged in the commission of or attempt to commit a robbery. After thorough review of the record and consideration of the relevant law, we conclude that none of these contentions has merit.

CONCLUSION

The prosecution violated appellants’ First Amendment rights by referring, during closing argument at the guilt phase of their trial, to appellants’ involvement in the occult. Such involvement was irrelevant to the crimes charged. We hold that this violation in the guilt phase of the trial should be reviewed under harmless-error analysis and conclude beyond a reasonable doubt that the remarks were harmless. We conclude that appellants’ other assignments of error also lack merit.
Accordingly, we affirm the order denying habeas corpus relief and the judgments of conviction of first degree murder. Having previously concluded that the death penalty sentences were not *1424 excessive considering the crimes and the characteristics of the appellants, we again affirm the sentences of death entered by the district court.
Steffen, C. J., and Young and Shearing, JJ., concur.

The State argues that no violation occurred because appellants’ co-defendant, not the State, introduced the evidence of occult beliefs and activities and because the evidence did not simply show the bad character of Moore and Flanagan, but was presented to show the control that they held over their co-defendant. This argument may be valid as far as it goes but overlooks the fact that the State affirmatively invoked the evidence during its closing argument as general character evidence.

Appellants argue also that NRS 213.085(1), effective July 1, 1995, rendered the instruction on parole and sentence modification inaccurate and misleading. The statute prohibits the Board of Pardons Commissioners in cases of first degree murder from commuting a sentence of death or life imprisonment without the possibility of parole to a sentence allowing parole. However, we have concluded that retroactive application of NRS 213.085(1) is unconstitutional. Miller v. Warden, 112 Nev. 930, 921 P.2d 882 (1996). Therefore, the statute has no effect on appellants’ cases.