*1318 OPINION
By the Court,
Young, J.:

FACTS

On April 14, 1992, a Las Vegas Metropolitan Police Officer found the lifeless body of Kevin Marble (“Marble”) lying face down on the ground in a pool of blood. Investigators found an eight-inch survival knife approximately eight feet from Marble’s body. The survival knife’s blade, serrated on one side and smooth on the other side, was covered with Marble’s blood.
The coroner determined that Marble died from two stab wounds. The first stab wound in Marble’s chest was four and one-half inches long and four to five inches deep. The chest wound penetrated Marble’s pulmonary artery. The second stab wound, one inch wide and one-half inch deep, sliced Marble’s neck and extended into Marble’s spinal column.
Several hours after Marble’s body was found, David Robert Riker (“Riker”) and an accomplice were arrested near Barstow, California, following a high-speed chase. At the time of the arrest, Riker was driving Marble’s work van. Inside the van, officers found several items taken from an earlier stabbing victim of the murderous duo.
The earlier victim, John M. Phippin (“Phippin”), was found brutally stabbed to death in a motel room in Blythe, California, on April 12, 1992. Phippin’s killers stole his work vehicle and abandoned it in an industrial park in Las Vegas. Officers recovered Phippin’s vehicle on April 14, 1992, the same day that Marble was butchered to death, two blocks from where the body of Marble was found.
Riker was charged with murder with use of a deadly weapon and robbery with use of a deadly weapon. The charges were based on the robbery and stabbing of Marble. On August 8, 1992, at his arraignment, Riker entered a plea of not guilty to both charges.
In November 1992, Riker told his attorney, Mark S. Blaskey (“Blaskey”), that he desired to plead guilty to both charges. Blaskey sent letters to three psychologists and/or psychiatrists *1319 asking them to examine Riker and evaluate if he was (1) competent to proceed to trial, and (2) competent to plead guilty. Riker was eventually evaluated a total of five times.
On November 19, 1992, Riker was examined by Marv A. Glovinsky (“Dr. Glovinsky”), a clinical psychologist. Dr. Glovinsky concluded that Riker’s depression impairs his ability “to give reasoned consideration to plea options available to him in this case. Again, while RIKER is considered to be competent to assist counsel in his own behalf, [sic] I, nevertheless, must deem him incapable to rationally enter a plea of guilty in his ‘defense’ in this case.” In addition, Dr. Glovinsky stated that Riker’s guilty plea was “nothing other than an effort to involve the State in a collusion whereby he can, quite frankly, be free to commit a sanctioned act of suicide.”
On August 10, 1992, Dr. Jack A. Jurasky (“Dr. Jurasky”) evaluated Riker and concluded that Riker was “competent to aid counsel and assist in his defense.” On December 1, 1992, Dr. William Hess (“Dr. Hess”) evaluated Riker and concluded that
Riker is a narcissistic young man who attempts to blame others for his circumstances. He has a history of impulsive behavior, including attempts on his own life, and there is evidence of chronic pessimism. . . . While [Riker’s] faculties were evidently impaired at the time the crimes were alleged to have been committed, his current mental status would not prevent him from assisting counsel in his defense, assuming that he chooses to be defended.
On January 13, 1993, Dr. William O’Gorman (“Dr. O’Gorman”) evaluated Riker and concluded that Riker “can assist his attorney in his own defense if he so desires.” Dr. O’Gorman, like Drs. Jurasky and Hess, made no specific recommendation whether Riker would be competent to enter a guilty plea.
While the aforementioned doctors were examining Riker, Blaskey discovered that Riker had an extensive history of mental disorders and asked Dr. Glovinsky to reinterview Riker. After reinterviewing Riker, Dr. Glovinsky reaffirmed his earlier conclusion by stating, “[Riker] is indifferent to death and dying. He does not feel that he is courageous enough to take his own life. He would, therefore, have the State assist him [in committing] suicide.” However, Dr. Glovinsky also reaffirmed the other doctors’ conclusion that Riker was “competent to participate in the legal-judicial process that currently awaits him.”
On August 13, 1993, a hearing was held before Judge Addeliar D. Guy to consider the issue of Riker’s desire to change his plea from not guilty to guilty. After Blaskey informed the court of the evaluations of Riker, the following conversation transpired:
*1320 THE COURT: Do you understand the nature of the charge contained against you in the Information in which you are charged with Count I, Murder With Use of a Deadly Weapon, Count II, Robbery With Use of a Deadly Weapon?
DEFENDANT RIKER: Yes, I do.
THE COURT: Do you understand those charges?
DEFENDANT RIKER: Yes, I do.
THE COURT: Are there any questions you want to ask me about them?
DEFENDANT RIKER: No.
THE COURT: .... Now you heard the statements that’s just been given by your counsel, do you understand those statements?[1]
DEFENDANT RIKER: Yes.
THE COURT: Are they correct?
DEFENDANT RIKER: Yes.
THE COURT: Is there anything you wish to add to them or not add to them?
DEFENDANT RIKER: No.
THE COURT: You understand that you’re asking me to take your plea of guilty to the charge of Murder With Use of a Deadly Weapon that will result in a finding of guilty to first degree murder, do you understand that?
DEFENDANT RIKER: Yes, I do.
THE COURT: And you understand that the extreme punishment on that, that you may get, is the death sentence, do you understand that?
DEFENDANT RIKER: Yes, I do.
THE COURT: Do you understand that by doing so you will not have a jury?
DEFENDANT RIKER: Yes, I do.
THE COURT: That your fate as to the penalty will be determined by a three-judge panel composed one of myself and two other judges to be selected by the Supreme Court?
DEFENDANT RIKER: Yes, I do.
The State then asked the court to make sure Riker knew he was not receiving any concessions on behalf of the State and that he was pleading guilty to first degree murder with use of a deadly weapon and might receive the death sentence. The district court asked Riker if he understood these things and Riker stated that he did.
The court then continued as follows:
*1321 THE COURT: That the penalty can be death, life with or without the possibility, do you understand that?
DEFENDANT RIKER: Yes, I do.
THE COURT: And because a deadly weapon was used, those felonies can be doubled, do you understand that?
DEFENDANT RIKER: Yes, I do.
THE COURT: And as the charge of Robbery With Use of a Deadly Weapon, the maximum time on that is fifteen years ... do you understand that?
DEFENDANT RIKER: Yes, I do.
THE COURT: And both of those could be enhanced to a consecutive to either the death penalty or the life with or life without the possibility of parole, do you understand that, sir?
DEFENDANT RIKER: Yes, I do.
The district court continued to make sure Riker knew exactly what the State had to prove and what his possible defenses were at trial. In addition, the district court made sure Riker was informed of the constitutional rights that he was waiving by pleading guilty. Finally, the district court outlined the exact facts that Riker was admitting.
The district court then accepted Riker’s guilty plea. However, the district court accepted Blaskey’s plan that Riker would continue to be examined by psychologists and/or psychiatrists; and if it turned out that he was incompetent to enter the guilty plea, then the plea would not be valid. On September 11, 1993, a psychological evaluation was performed by Dr. Lewis M. Etcoff (“Dr. Etcoff”).
When Dr. Etcoff asked Riker why he wanted to plead guilty to the murders, Riker responded by saying it was an “impulsive decision.” Riker stated, “I really wanted to die; I do and I don’t. I’m tired of all the pain. I get so irritable and angry; I can’t get along with people.” Dr. Etcoff’s conclusion was that Riker entered a guilty plea so that he could commit suicide. Dr. Etcoff also concluded, however, that although Riker might not have been competent to plead guilty, he is competent to “aid in his own defense and to consult with his attorney.”
On September 28, 1993, Riker filed motions to withdraw his guilty plea and declare NRS 175.558 unconstitutional. The district court denied both Riker’s motions.
On February 22-25, 1994, a three-judge panel[2] conducted a penalty hearing. The three-judge panel concluded that the following mitigating circumstances existed: (1) Riker was only twenty *1322 at the time he committed the crime, and (2) Riker has a history of mental disturbance. In addition, the three-judge panel concluded that there was one aggravating circumstance — that the murder of Marble took place during the commission of a robbery. The three-judge panel decided that the aggravating circumstance outweighed the mitigating circumstances, and therefore Riker should receive the death penalty.
On April 7, 1994, a judgment of conviction for murder in the first degree with use of a deadly weapon was entered against Riker. In addition, a judgment was entered sentencing Riker to death. Riker appeals, arguing, among other things, that (1) the district court erred by denying Riker’s motion to withdraw his guilty plea; (2) three-judge panels are unconstitutional; (3) the death penalty sentencing scheme is unconstitutional; (4) the three-judge panel erred by considering evidence of another uncharged murder; and (5) the State committed prosecutorial misconduct during the penalty hearing.
We affirm Riker’s judgment of conviction and sentence for the following reasons.

DISCUSSION

The validity of Riker’s guilty plea

On appeal from a district court’s denial of a motion to withdraw a guilty plea, this court “will presume that the lower court correctly assessed the validity of the plea, and we will not reverse the lower court’s determination absent a clear showing of an abuse of discretion.” Bryant v. State, 102 Nev. 268, 272, 721 P.2d 364, 368 (1986).
Riker first argues that during his plea canvass, he was not explicitly advised that probation was not a sentencing option to a conviction of first degree murder with use of a deadly weapon. Riker cites Aswegan v. State, 101 Nev. 760, 710 P.2d 83 (1985), and Meyer v. State, 95 Nev. 885, 603 P.2d 1066 (1979), in support of his argument that a failure to advise a defendant that probation is not a sentencing option renders a subsequent guilty plea ineffective.
In both Aswegan and Meyer, this court held that the defendants entered their guilty pleas involuntarily because they were not informed that probation was not available to someone convicted of sexual assault. In Meyer this court stated, “Whether or not probation is available is critical to the defendant’s understanding of the consequences of his guilty plea. Therefore, when an offense is not probational, the district judge has a duty to insure *1323 that the record discloses that the defendant is aware of that fact.” Meyer, 95 Nev. at 887, 603 P.2d at 1067 (citations omitted).
The issue currently before this court then is whether the district court adequately ensured that Riker was aware that probation was not a sentencing option for first degree murder. We conclude that the best course of action for district courts during a plea canvass would be to affirmatively state that probation is not a sentencing option. However, in the case at bar, the fact that the district court did not affirmatively state that probation was not a sentencing option for first degree murder was not prejudicial error because the district court took other steps to ensure that Riker was aware, even if by implication, that probation was not a sentencing option.
The State made the following declaration with Riker present:
If the Court please, I wanted to make sure that Mr. Riker also understands that the maximum punishment is of course capital punishment, the death sentence, but he may also receive either life without the possibility of parole, which of course would be enhanced — that is doubled by the deadly weapon allegation — or a punishment of life with the possibility of parole, which also would be doubled as a result of the deadly weapon enhancement, wherein the minimum parole would be after twenty calendar years. I want the Court to make sure that he fully understands those consequences.
(Emphasis added.) The district court then asked Riker if he understood the State’s remarks, to which he replied, “Yes, I do.”
In addition, the district court told Riker that the penalty for first degree murder can be “death, life with or without the possibility.”[3] Riker again stated that he understood these penalty options. Because Riker understood the three options available for sentencing, he implicitly understood that other options were not available.
Finally, Riker was informed by the district court, Blaskey, and even the State that he could receive the death sentence by pleading guilty.[4] Considering the implication that probation was not included among the sentencing options and the fact that Riker was informed that the death sentence was likely, it was harmless error that he was not affirmatively informed that probation was not an option.
*1324 Riker’s second argument that he should have been allowed to withdraw his guilty plea is that the degree of competence required to stand trial is a lesser degree than the degree of competence required to plead guilty. However, according to the United States Supreme Court’s opinion in Godinez v. Moran, 509 U.S. 389, 113 S. Ct. 2680 (1993), Riker’s argument is without merit.
The facts in Moran are similar to the facts in the case at bar. Richard Allen Moran (“Moran”) killed a bartender and a saloon patron in Las Vegas. Moran then went to the home of his ex-wife, killed her, and then attempted suicide. Based on conclusions of two psychiatrists that Moran was competent to stand trial, the district court accepted his guilty plea. This court affirmed Moran’s conviction as to the murders of the bartender and the saloon patron and eventually affirmed the denial of his petition for post-conviction relief which argued that he was not competent to change his plea from not guilty to guilty.[5] Id. at 391-91, 113 S. Ct. at 2682-85.
Moran’s case eventually reached the United States Court of Appeals for the Ninth Circuit. The Ninth Circuit reversed Moran’s entry of his guilty plea because it adhered to the view that “the competency standard for pleading guilty or waiving the right to counsel is higher than the competency standard for standing trial.” Id. at 395, 113 S. Ct. at 2685. The Ninth Circuit relied on the facts that Moran attempted suicide, did not want to present mitigating evidence, responded monosyllabically to the trial court’s questions, and was on medication when he waived his right to counsel and entered a guilty plea. Id. at 394 n.3, 113 S. Ct. at 2684 n.3.
The Court overruled the Ninth Circuit, reasoning that
all criminal defendants — not merely those who plead guilty — may be required to make important decisions once criminal proceedings have been initiated. And while the decision to plead guilty is undeniably a profound one, it is no more complicated than the sum total of decisions that a defendant may be called upon to make during the course of a trial .... This being so, we can conceive of no basis for demanding a higher level of competence for those defendants who choose to plead guilty.
Id. at 398-99, 113 S. Ct. at 2686. Therefore, Riker’s argument that there is a higher standard of competency required to plead guilty than to stand trial is without merit.
*1325 The question remains, however, whether Riker was competent to enter a guilty plea according to the Court’s standard of competency to stand trial. In Moran, the Court stated that the standard set forth in Dusky v. United States, 362 U.S. 402 (1960), should be applied to defendants who plead not guilty and wish to stand trial and to defendants who plead guilty. Moran, 509 U.S. at 397, 113 S. Ct. at 2686.
In Dusky the Court held that the standard for competency to stand trial is whether the defendant has “sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding” and a “rational as well as factual understanding of the proceedings against him.” Dusky, 362 U.S. at 402. In the case at bar, all five psychologists and/or psychiatrists concluded that Riker was competent to stand trial. Drs. Jurasky, Hess and O’Gorman concluded that Riker could aid his counsel in his defense. In addition, Dr. Glovinsky, after reviewing Riker’s history of mental disorders, concluded that Riker is “competent to participate in the legal-judicial process that currently awaits him.” Finally, Dr. Etcoff concluded, also after reviewing Riker’s history of mental disorders, that although Riker might not have been competent to plead guilty, he is competent to “aid in his own defense and to consult with his attorney.”
Therefore, not one doctor could testify that although Riker had mental disorders, he could not understand or participate in the judicial process. In addition, considering the plea canvass, Riker demonstrated that he understood the proceedings against him. Accordingly, we conclude that Riker was competent to enter his plea according to the Dusky standard.
Riker’s third argument regarding the invalidity of his guilty plea is that because he was unaware that he had any defenses that could be advanced in the guilt phase of trial, he did not knowingly and voluntarily enter his guilty plea. Riker argues that he learned of the defenses of diminished capacity and intoxication from Dr. Etcoff’s evaluation — conducted after Riker’s guilty pleas were entered. Initially, we note that because first degree murder, but not robbery, is a specific intent crime, these defenses would only be relevant to the murder charge.
On December 1, 1992, Dr. Hess reported that Riker began consuming alcohol at the age of eleven or twelve and that it has “progressed until recently, when it has been very heavy.” Hess also reported that Riker “was under the influence of both drugs and alcohol at the time the crimes are alleged to have occurred, and that his mental capacity at that time was significantly dimin *1326 ished.” The hearing where Riker entered his guilty plea was held on August 13, 1993, over eight months after Dr. Hess’ report. In addition, all evaluations conducted before Riker entered his guilty plea revealed that Riker had some mental disorders. Therefore, at the time Riker entered his guilty plea, both Riker and his counsel knew that the defenses of intoxication and diminished capacity would be available to Riker if he went to trial.
In addition, during Riker’s plea canvass, the district court specifically asked Riker if he “had an opportunity to discuss with [his] attorneys any possible defenses to these charges.” Riker responded that he had.

The constitutionality of three-judge panels

Riker argues that imposition of the death penalty by a three-judge panel is unconstitutional because its decisions are arbitrary and capricious. This court has recently affirmed its earlier decisions holding that imposition of the death penalty by a three-judge panel passes constitutional muster. See Paine v. State, 110 Nev. 609, 617, 877 P.2d 1025, 1030 (1994), cert. denied, U.S., 115 S. Ct. 1405 (1995) (“[W]e perceive no reliable basis for deviating from our previous determinations on this identical issue.”). Riker has not provided additional and more persuasive arguments than those already considered by this court to persuade us to overrule our decision in Paine.

Evidence of an uncharged murder during the penalty hearing

Riker argues that the three-judge panel erred by incorrectly applying the death penalty laws. Specifically, Riker argues that it was error for the three-judge panel to consider the fact that Riker might have been involved in the murder of Phippin in Blythe, California.
Evidence of uncharged crimes may be admitted during a penalty hearing only after any aggravating circumstances have been established beyond a reasonable doubt. Guy v. State, 108 Nev. 770, 782, 839 P.2d 578, 586 (1992) (citation omitted). As long as this evidence is admitted after the aggravating circumstances have been proved, the court will have broad discretion in admitting the evidence under NRS 175.552. Id.
Riker first argues that the evidence of Phippin’s murder was considered before the aggravating circumstance was proved. Riker bases his argument on the fact that on April 7, 1994, during the sentencing hearing, which occurred months after the penalty hearing, Judge Guy stated, “In this case there were two deaths, *1327 and in the Sean White case[6] there was only one death.” Blaskey then pointed out to the panel that the “second death should never have entered into this panel’s consideration.” We conclude that Riker’s argument that the three-judge panel considered Phippin’s murder before it found the aggravating circumstance was proved, simply based on this statement, to be unsubstantiated.
In addition, in Gallego v. State, 101 Nev. 782, 791, 711 P.2d 856, 863 (1985), cert. denied, 479 U.S. 871 (1986), where this court held that properly qualified evidence of uncharged murders was highly relevant to defendant’s death worthiness, the evidence of the uncharged murders was presented to the jury during the trial. Subsequently, at the penalty hearing, the jury was simply instructed to consider this evidence after it determined the aggravating circumstances. Id. Accordingly, it does not necessarily follow that the trier of fact cannot hear the evidence of uncharged crimes before it considers the aggravating circumstances, only that the uncharged crimes cannot be used to prove the aggravating circumstances.
Finally, the only aggravating circumstance found in this case was that Riker committed the murder during the course of a robbery. Riker had pleaded guilty to the murder and the robbery. Accordingly, the robbery was clearly already proved beyond a reasonable doubt before the evidence of the Phippin murder was considered.
Riker also argues that evidence of the Phippin murder should not have been considered because Riker admitted to the Phippin murder during the course of a psychological examination. This argument is without merit for two reasons. First, evidence otherwise not admissible at trial is generally admissible at a penalty hearing. See NRS 175.552. Second, the fact that Riker murdered Phippin was proved even without his confession to the psychologist. The body of Phippin was found in a motel room in Blythe, California, in April 1992. Two days later, Phippin’s Suburban was discovered in Las Vegas only blocks from where Marble was robbed and murdered by Riker. When Riker was arrested, he was driving Marble’s van. In the van were several items that were missing from Phippin’s Suburban.
Accordingly, the three-judge panel did not err by considering the evidence of Phippin’s murder during the penalty hearing.

Prosecutorial misconduct

We have considered Riker’s allegations of prosecutorial mis *1328 conduct. The four alleged instances of prosecutorial misconduct were not objected to by Riker’s counsel during the course of the trial.
We conclude that Riker’s argument regarding prosecutorial misconduct fails for two reasons. First, Riker failed to object to any of the remarks by the State. As this court has stated, “[i]n order to preserve the issue of prosecutorial misconduct for appeal, the defendant must raise timely objections and seek corrective instructions.” Parker v. State, 109 Nev. 383, 391, 849 P.2d 1062, 1067, cert. denied, U.S., 114 S. Ct. 570 (1993) (citations omitted).
Second, because Riker failed to object, this court should review the alleged prosecutorial misconduct only if it is considered plain error. Therefore, Riker would have to show that the remarks made by the prosecutor were “patently prejudicial.” See Libby v. State, 109 Nev. 905, 911, 859 P.2d 1050, 1054 (1993). We conclude that Riker has failed to show prejudice to this degree.

CONCLUSION

We conclude that Riker has not demonstrated that the district court’s failure to allow him to withdraw his guilty plea was error. We also conclude that the three-judge panel, as currently used in Nevada to sentence defendants who plead guilty, is constitutional. Finally, we conclude that the district court did not err by considering evidence of an uncharged murder during the penalty hearing. The judgment and sentence of death are affirmed.
Steffen, C. J., and Shearing, J., concur.

 The statements by Blaskey indicated that he discouraged Riker from pleading guilty. In addition, Blaskey informed Riker that he would waive his right to a jury and probably receive the death penalty when he appeared before the three-judge panel for sentencing.

The three-judge panel was composed of Judges Addeliar D. Guy, Richard Wagner, and James A. Stone.

These three options accurately represent the possible sentences that a person convicted of first degree murder may receive. See NRS 200.030(4).

In fact, Riker’s counsel informed him that he would most likely receive the death penalty.

Moran also argued that he was not competent to waive his right to counsel.

The Sean D’Anore White case, Docket No. 25516, is a case currently on appeal before this court.