CHARLES MANLEY, APPELLANT, v. THE
STATE OF NEVADA, RESPONDENT.

No. 31418

June 7, 1999                                            979 P.2d 703

---

*David M. Schieck,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *Christopher Laurent,* Chief Deputy District Attorney, Clark County, for Respondent.

# OPINION

*Per Curiam:*

In March 1995, appellant Charles Manley shot Roxanne Logan in the back of the head, killing her. Appellant claimed the shooting was an accident. The jury convicted appellant of one count each of first degree murder with the use of a deadly weapon, robbery with the use of a deadly weapon, and possession of a firearm by an ex-felon. At the subsequent penalty hearing, the jury found that five aggravating circumstances outweighed four mitigating circumstances and returned a verdict of death. On appeal, appellant contends, among other things, that the district court erred in ruling that he waived the attorney-client privilege. We agree with appellant that the district court erred, conclude that this error was not harmless, and reverse appellant's conviction.

## FACTS

On February 9, 1996, appellant filed a motion to assert the attorney-client privilege between him and two of his attorneys: Mark Wolf, who was appellant's lead trial counsel, and Roland Robinson, with whom appellant initially consulted in California. The state opposed the motion on the ground that it only wished to question Wolf and Robinson as to the chain of custody of appellant's truck and clothing. Wolf and Robinson knew about the chain of custody because they had accompanied appellant back to Las Vegas from California, where he had driven after the shooting. Wolf and Robinson also told the Las Vegas police where

appellant's truck was parked, and gave the police clothing appellant had given them.

At a February 15, 1996 hearing, the court ruled that the attorney-client privilege was not violated if the state only wanted to ask whether Wolf and Robinson brought appellant's truck and clothing to the police. When the issue was raised again at an August 15, 1996 hearing, the court reiterated that communications were not allowed as a subject of inquiry but acts were.

In its case-in-chief, the state presented incriminating testimony of three prisoners with whom appellant was incarcerated. In an attempt to rebut this evidence and show that appellant did not discuss his case with anyone he was imprisoned with, Wolf asked appellant the following questions on direct examination:

> DEFENSE COUNSEL WOLF: Over the course of traveling to Las Vegas from San Diego, just asking yes or no, did we talk about anything?
> APPELLANT: Yes.
>
> . . . .
> DEFENSE COUNSEL WOLF: . . . Did you have in your mind any plan as to whether or not you would say anything about your case when you went to custody?
> APPELLANT: No. You told me not to say anything about anything.

Later on direct examination, Wolf asked appellant the following questions as part of a series of questions explaining why appellant jumped bail and where he went when he did so:

> DEFENSE COUNSEL WOLF: At some point did you end up calling me in San Diego?
> APPELLANT: Yes, I did.
> DEFENSE COUNSEL WOLF: And would you describe for the jury my state of mind as it appeared to you on the telephone?
> APPELLANT: You were pissed. Everybody was pissed.
> DEFENSE COUNSEL WOLF: Did you tell me where you were?
> APPELLANT: No.

At the end of direct examination, the prosecutor asked to approach the bench, and an off-the-record bench conference took place. The court reporter did not record what was said during this conference. The transcript of the record on appeal provides only, "(At the in-camera proceeding, the Court has declared that Mr. Manley has waived the attorney-client privilege.)"

During cross-examination the next day, the court noted Wolf's continuing objection to the court's finding as to waiver. Directly

thereafter, the prosecutor asked appellant a series of questions concerning what he told Wolf and Robinson. The prosecutor began by asking appellant, "When you told [Wolf and Robinson] the story of the accident did you recognize the importance of telling them everything?" Appellant replied that he did not know whether he told them everything or not. The prosecutor then asked appellant the following questions, among others: "Did you tell them the truth?"; "Did you give those attorneys a part of a watch?"; "Did you tell those attorneys that that watch was broken off during the struggle with Roxanne?"; "Did you give the attorneys clothing?"; "And did you tell your attorneys that those were the clothes that you were wearing on the night of the unfortunate accident?" Appellant answered all of these questions affirmatively.

The prosecutor also asked appellant, "Did you tell your attorneys that you were, when you were sitting on the couch in the house that you were startled by Roxanne and [her friend] entering the house?", "Did you tell them that you drew your weapon believing these [sic] were prowlers?", "Did you tell them that seeing that it was Roxanne you put the nine millimeter between the cushions?", and "Did you tell them that the cushions were a normal hiding place for the gun?" Appellant responded negatively to these questions.

In response to the prosecutor's additional questions, appellant testified that he told his attorneys that he and Logan had been arguing about her missing wallet, credit cards, and cash; did not tell his attorneys that she had accused him of stealing those items; told them that he left the living room to go to the kitchen; did not tell them that Logan left the bedroom and went to the couch to get the gun; did not tell them that after she got the gun from the couch she continued to accuse him of stealing her wallet, credit cards, and cash; told them that he tried to take the gun away from her; did not tell them that he forced her right arm up behind her back; and did not tell them that as he pushed her arm up behind her back, the gun went off accidentally, killing her.

At the next break, the court stated that its ruling had been that the attorney-client privilege between appellant and Wolf had been waived, and that the court did not intend to make that finding as to Robinson. The prosecutor then stated that he believed that the court had concluded that the privilege had been waived as to both Wolf and Robinson, and Wolf said that he objected to any waiver. The court responded that appellant waived the privilege himself.

## DISCUSSION

Appellant contends that the district court erred in determining that the attorney-client privilege was waived as to Wolf without

making any findings on the record as to the basis for the waiver, and in allowing the prosecutor to cross-examine him about his conversations with Robinson as well. Appellant also argues that even if he chose to waive the privilege by testifying about discussions with Wolf on certain subjects, any waiver was limited to those subjects and would not encompass discussions about the shooting. Finally, appellant argues that the cross-examination on privileged matters deprived him of assistance of counsel and due process under the Sixth and Fourteenth Amendments to the United States Constitution. *See* U.S. Const. amends. VI and XIV, § 1.

Initially, we note that a determination on the record as to why the privilege was waived would have facilitated this court's review of this issue. We further note that Supreme Court Rule 250 currently requires the district court to ensure that all proceedings in a capital case are reported and transcribed. *See* SCR 250(5)(a).

*The attorney-client privilege*

In questioning appellant, the prosecutor delved into matters which can only be characterized as confidential communications between appellant and his attorneys, which are protected by the attorney-client privilege. *See* NRS 49.055 (defining "confidential" communication); NRS 49.095 (client has a privilege to refuse to disclose, and to prevent anyone else from disclosing, confidential communications between the client and the lawyer made to facilitate giving legal services to the client); NRS 49.105 (client may claim privilege, or lawyer may do so on behalf of client).

*No waiver of the attorney-client privilege*

As set out above, appellant testified on direct examination as to two conversations with Wolf: one on a drive from San Diego to Las Vegas, and the other on the telephone when appellant jumped bail. Where a client "voluntarily reveals portions of the communications with the attorney, 'those revelations amount to a waiver of the attorney-client privilege as to the remainder of the conversation or communication about the same subject matter.' " Lisle v. State, 113 Nev. 679, 701, 941 P.2d 459, 473 (1997) (quoting In re Grand Jury Jan. 246, 651 N.E.2d 696, 700 (Ill. App. Ct. 1995)), *cert. denied,* 525 U.S. 830 (1998). However, for waiver to occur, the witness's answers must be " 'wide enough in scope and deep enough in substance to constitute a "significant part of the communication." ' " *Id.* (quoting Mitchell v. Superior Court, 691 P.2d 642, 648 (Cal. 1984) (quot-

ing Travelers Ins. Co. v. Superior Court, 191 Cal. Rptr. 871 (Ct. App. 1983))). "Merely acknowledging the fact that the witness discussed a subject with his attorney does not waive the privilege." *Id.*

Appellant did not disclose a "significant part" of his communications with Wolf: he only testified on direct examination that Wolf told him not to say anything, Wolf was upset when appellant telephoned him, and appellant did not tell Wolf where he was. This minimal disclosure did not constitute a waiver of the attorney-client privilege. *See* People v. Kor, 277 P.2d 94, 99-100 (Cal. Ct. App. 1954) (holding that defendant's statements on direct examination that he told his attorney what had happened were general statements which did not disclose what the defendant said in substance, that defendant did not voluntarily disclose privileged communications in his responses to questions on cross-examination by co-defendant's counsel and prosecutor, and that the trial court erred in permitting examination of defendant's attorney as to those confidential communications). Accordingly, we conclude that the district court erred in concluding that appellant waived the privilege and in permitting the prosecutor to cross-examine appellant as to privileged matters.[1]

*Violation of the attorney-client privilege as a Sixth Amendment violation*

Appellant failed to provide any argument or authority addressing whether a violation of the attorney-client privilege violated his right to counsel under the Sixth Amendment to the United States Constitution, and whether such a violation is reversible per se or should be reviewed under a harmless error standard. *See* Chapman v. California, 386 U.S. 18 (1967). We address these issues despite this deficiency. We conclude that appellant's Sixth Amendment right to counsel was violated.

Although the attorney-client privilege has been termed merely a rule of evidence and not a constitutional right, government interference with the attorney-client relationship may implicate Sixth Amendment rights. Clutchette v. Rushen, 770 F.2d 1469, 1471

---

[1]We note that, contrary to the state's assertion that Wolf made a second waiver of the privilege by discussing a conversation with appellant, Wolf could not waive the privilege. While the attorney may claim the privilege on the client's behalf, only the client has the ability to waive it. *See* NRS 49.095.

(9th Cir. 1985) (citing Weatherford v. Bursey, 429 U.S. 545 (1977)). Governmental intrusion violates the Sixth Amendment only when it "substantially prejudices" the defendant. *Id.* Here, we conclude that the prosecutor's inquiry into appellant's confidential relationship with his attorneys substantially prejudiced appellant. The prosecutor's cross-examination damaged appellant's credibility by implying that appellant had not been entirely truthful even with his own attorneys, and had either omitted information detrimental to him or simply lied to them regarding what happened the night of the shooting. The jury's assessment of appellant's credibility was crucial in this case, where appellant claimed the shooting was accidental and only appellant and Logan were present when she was shot. Therefore, we conclude that the prosecutor's inquiry violated appellant's Sixth Amendment right to counsel.

## Review under the harmless error standard

We further conclude that this violation should be reviewed under the harmless error standard enunciated in *Chapman. Chapman* held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman,* 386 U.S. at 24. In Arizona v. Fulminante, 499 U.S. 279, 306-12 (1991), Chief Justice Rehnquist, speaking for a majority of the court, distinguished between "trial error" and "structural error" in determining whether a federal constitutional violation could be analyzed under the *Chapman* test or required automatic reversal. The Court explained that "structural error" is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310. Examples of structural error include total deprivation of the right to counsel at trial, a judge who is not impartial, the unlawful exclusion of members of the defendant's race from a grand jury, deprivation of the right to self-representation at trial, and deprivation of the right to public trial. *Id.* at 309-10. Because the entire conduct of the trial is affected, structural error defies analysis by "harmless-error" standards. *Id.*

"Trial error," on the other hand, is any constitutional error "which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at

307-08. We conclude that the instant error was simply an error in the trial process itself that occurred "during the presentation of the case to the jury" and that did not affect the framework within which the trial proceeded. *See* People v. Tamborrino, 263 Cal. Rptr. 731, 735-38 (Cal. Ct. App. 1989) (applying *Chapman* to a claimed violation of the attorney-client privilege). Therefore, we believe that the instant error constitutes trial error, which is susceptible to a harmless error analysis under *Chapman*.

Admittedly, *Chapman* indicates that a violation of the right to counsel may be error that is reversible per se. *Chapman* explains "that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," citing Gideon v. Wainwright, 372 U.S. 335 (1963), as support. *Chapman,* 386 U.S. at 23 & n.8. We do not think that *Chapman* meant, in citing *Gideon,* that all errors involving the right to counsel are reversible per se. This is particularly true where, as here, the deprivation of the right to counsel differs greatly from that in *Gideon*. Whereas in *Gideon* the defendant did not have counsel at trial because the trial court refused to appoint counsel under state law, in the instant case appellant has been represented by counsel at all times.[2]

Applying *Chapman,* we are constrained to reverse appellant's conviction because we cannot conclude beyond a reasonable doubt that the prosecutor's questioning did not contribute to the verdict. That is, we cannot conclude that the district court's error in permitting the prosecutor to cross-examine appellant as to what he told his attorneys was harmless beyond a reasonable doubt. As explained above, appellant was substantially prejudiced by the prosecutor's inquiry into whether he told his attorneys certain facts about Logan's death.

[2] We, too, have cited *Gideon*, along with Glasser v. United States, 315 U.S. 60 (1942), and Doughty v. Maxwell, 376 U.S. 202 (1964), for the proposition that automatic reversal occurs where the defendant is denied substantive due process. Guyette v. State, 84 Nev. 160, 166-67 n.1, 438 P.2d 244, 248 n.1 (1968). However, *Guyette* does not stand for the proposition that all errors involving the right to counsel are reversible per se. Neither *Glasser* nor *Doughty* stands for the proposition that denial of the right to counsel, as occurred in the instant case, constitutes error that is reversible per se. *Glasser* held that where the court appointed the defendant's attorney to also represent a codefendant, the defendant's Sixth Amendment right to effective assistance of counsel was denied because the attorney's representation of the defendant was not as effective. *Doughty* reversed a judgment of conviction under *Gideon* where the defendant was not appointed counsel. *See also* Doughty v. Sacks, 191 N.E.2d 727 (Ohio 1963), *rev'd,* 376 U.S. 202 (1964); Doughty v. Sacks, 183 N.E.2d 368 (Ohio 1962), *vacated,* 372 U.S. 781 (1963).

124

*Other contentions*

Appellant also argues that the prosecutors committed misconduct. One of the prosecutors inappropriately asked appellant why another witness would "get an idea that an ex-convict would want anal sex." This question, which was really a comment, essentially asked the jurors to speculate that appellant engaged in anal sex while he was in prison. We conclude that reversal is not warranted on this ground because appellant objected immediately and the court sustained the objection and struck the question. *See* Stewart v. State, 94 Nev. 378, 379-80, 580 P.2d 473, 474 (1978). This same prosecutor also made several other comments for which the court sustained objections or admonished the prosecutor. Although those comments were inappropriate, they do not constitute reversible error.

The other prosecutor also made an inappropriate comment, telling defense counsel, "Certainly we could do that one exhibit at a time for the mentally challenged," when defense counsel asked that the prosecutor go more slowly in admitting an exhibit. Appellant failed to object to this comment, and we conclude that it was not patently prejudicial. *See* Riker v. State, 111 Nev. 1316, 1328, 905 P.2d 706, 713 (1995). On retrial, however, we direct the prosecutors to refrain from interposing these kinds of remarks.

Next, appellant argues that the district court abused its discretion in denying his motion for a mistrial after the prosecutor questioned one of the state's witnesses about her conversation with Wolf about appellant's alibi. Appellant claims that allowing the prosecutor to question the witness as to the alibi forced him to testify in order to explain that he was not involved in filing the notice of alibi. We conclude that the district court did not abuse its discretion in denying appellant's motion for a mistrial. *See Lisle,* 113 Nev. at 700, 941 P.2d at 473. Defense counsel timely filed the third amended notice of alibi only fourteen days before trial and never formally withdrew that notice.

Third, appellant argues that the district court erred in denying his motion to sever the ex-felon in possession of a firearm charge from the other two counts charged. Although we conclude that the court did not abuse its discretion here, on retrial the district court should sever the ex-felon in possession of a firearm charge pur-

suant to Brown v. State, 114 Nev. 1118, 1126, 967 P.2d 1126, 1131 (1998).

Fourth, appellant argues that it is legally impossible to rob a dead person and that the jury was therefore erroneously instructed on robbery. Appellant failed to object to the robbery instruction or propose a different instruction when the court settled the jury instructions, and we conclude that no patently prejudicial error occurred here which warrants this court's consideration of this issue. *See* Flanagan v. State, 112 Nev. 1409, 1422, 930 P.2d 691, 700 (1996), *cert. denied,* 523 U.S. 1083, 118 S. Ct. 1534-35 (1998); Sheriff v. Jefferson, 98 Nev. 392, 649 P.2d 1365 (1982); Norman v. Sheriff, 92 Nev. 695, 558 P.2d 541 (1976).

Fifth, appellant argues that the district court abused its discretion in limiting closing argument because that limitation denied him due process, infringed upon his right to counsel under the Sixth Amendment to the federal constitution, and prejudiced him. We conclude that the district court did not abuse its discretion in limiting closing argument to two hours at the conclusion of the evidentiary phase of trial and in not permitting defense counsel an additional ten minutes to argue. The prosecutor only argued for seven minutes more than defense counsel and the jury had already retired to begin deliberations when appellant requested more time. *Cf.* Collier v. State, 101 Nev. 473, 481-82, 705 P.2d 1126, 1131-32 (1985) (setting aside death sentence where penalty phase closing argument was limited to one hour), *modified on other grounds by* Howard v. State, 106 Nev. 713, 719, 800 P.2d 175, 178 (1990).

Sixth, appellant argues that his state statutory and federal constitutional speedy trial rights were violated. Appellant's state statutory right to a speedy trial was not violated. Even though appellant invoked his right to trial within sixty days after arraignment, appellant waived that time limit by instructing his attorney to file a pre-trial petition for a writ of habeas corpus. *See* NRS 34.700; NRS 178.556(1). Further, the habeas petition was not deficient, as appellant claims. In the petition, appellant consented to continue the trial indefinitely if the petition was not decided within fifteen days before the date set for trial; appellant also "personally authorized" his attorney to file the petition. *See* NRS 34.700(1)(b). Further, NRS 34.700 is not unconstitutional. *See* Randolph v. Sheriff, 93 Nev. 532, 534, 569 P.2d 408, 410 (1977).

Neither was appellant's federal constitutional right to a speedy trial violated. Admittedly, appellant had to wait approximately two years and three months after arraignment before going to trial. However, appellant was responsible for the part of the delay caused by filing the habeas petition, adding Wolf as his counsel, and moving to continue the trial date. The other reasons for the delay were legitimate conflicts with the state's and the court's schedules. Appellant also failed to show particularized prejudice arising from the delay. Appellant provides no facts to support his argument that the state's "jailhouse snitches were manufactured" during the delay. Further, appellant caused any prejudice that resulted from the testimony of the "jailhouse snitches" by speaking with them in the first place. In addition, any prejudice appellant suffered from the jury learning that he jumped bail was his own fault. *See* Doggett v. United States, 505 U.S. 647, 655-56 (1992); Barker v. Wingo, 407 U.S. 514, 530 (1972).

Last, appellant argues that, in the penalty phase, the state should not have been able to seek both the "receiving money" and the robbery aggravating circumstances because they arise from the same act. We agree that the "receiving money" and the robbery aggravating circumstances are duplicative here. *See* Lane v. State, 114 Nev. 299, 304, 956 P.2d 88, 91 (1998). The state may not seek both of these aggravating circumstances when they are based on the same facts.

Appellant also argues that the district court erred in failing to sua sponte stop witnesses from mentioning his criminal history, the district court directed demeaning comments to defense counsel which denied him a fair trial, the court abused its discretion in sustaining objections to certain defense testimony, insufficient evidence was presented to convict him of robbery, the jury instructions did not properly define first degree murder, and the court erred in instructing the jury that its verdict may never be influenced by sympathy. We have considered these contentions and conclude that they lack merit.

## CONCLUSION

We conclude that the district court erred in ruling that appellant waived his attorney-client privilege and in permitting the state to cross-examine appellant concerning matters he discussed with his attorneys. The disclosure of privileged attorney-client information during that cross-examination violated appellant's Sixth

Amendment right to counsel, which we conclude did not constitute harmless error in this case. Accordingly, we reverse appellant's conviction and remand for further proceedings consistent with this Opinion.[3]

LEAVITT, J., dissenting:

I agree with the majority that the alleged error concerning violation of the attorney-client privilege is susceptible to a harmless error analysis under Chapman v. California, 386 U.S. 18 (1967). However, unlike the majority, I conclude that this error was harmless and the judgment therefore need not be reversed. The test in such cases is whether it is clear beyond a reasonable doubt that the admission of the evidence did not contribute to appellant's conviction. *See id.* at 24.

Appellant originally sought to be represented by Roland Robinson and initially consulted with Robinson; however, at trial Mark Wolf represented appellant. Appellant voluntarily took the stand and testified on direct examination about the contents of the conversations he had with Wolf on two occasions. The district court then made a ruling that by mentioning this on direct examination he had waived his attorney-client privilege. It is unclear whether the district court ordered the privilege waived as to Wolf only or as to both Wolf and Robinson. The next day the prosecutor began questioning appellant on cross-examination by asking, "Did you tell your attorneys . . . ?" He then recited facts favorable to the state's case. The prosecutor could have asked the same questions by simply stating, "Is it true . . . ?" He then could have recited facts favorable to the state.

The rule established in Lisle v. State, 113 Nev. 679, 701, 941 P.2d 459, 474 (1997), requires that before a waiver occurs the witness's answers must be " 'wide enough in scope and deep enough in substance to constitute a "significant part of the communication." ' " *Id.* (quoting Mitchell v. Superior Court, 691 P.2d 642, 648 (Cal. 1984) (emphasis omitted) (quoting Travelers

---

[3]The dissent correctly notes that the case against appellant was strong and that breaches of the attorney-client privilege are subject to a harmless error analysis. In our view, however, the incursion into the attorney-client relationship was so prolonged and profound that such an analysis cannot save this conviction.

Further, given the heightened due process standard that applies to death penalty cases, the defense of this matter by appellant's attorneys would ultimately require a retrial following lengthy post-conviction proceedings in either state or federal court. Thus, rather than delay the inevitable and risk the loss of evidence/witnesses over time, a new trial should be commenced at the earliest possible time.

Ins. Companies v. Superior Court, 191 Cal. Rptr. 871, 876 (Ct. App. 1983))). It is clear in this instance that appellant did not waive the privilege because he did not testify about " 'a significant part of the communication.' " *Id.* (quoting *Travelers,* 191 Cal. Rptr. at 876).

Cross-examination of witnesses is limited to the subject matter of the direct examination and matters affecting the credibility of a witness. NRS 50.115(2).[1] Therefore, it was proper for the prosecutor during cross-examination to ask questions concerning appellant's testimony about what happened the night of the shooting to test his credibility. Although the prosecutor prefaced his questions with, "Did you tell your attorney . . . ?," he was merely pointing out the differences between appellant's testimony and the state's version of what occurred. Appellant told other people different versions of what happened that night.

Appellant fled the jurisdiction after posting bail and was only caught after being the subject of the national television program, *America's Most Wanted.* He has threatened witnesses who testified against him in his previous felony trials, declaring that he would kill them. He placed a rifle in the vagina of one victim and threatened to kill her. The victim in this case was killed "execution style"[2] while she was so drunk she had fallen off a barstool, and a friend had to bring her home because she could not walk straight. Appellant's claim of accidental shooting is diminished by his failure to call an ambulance. Instead, he grabbed his clothes, the keys to the truck, and fled to California in an attempt to set up an alibi defense.

This court must examine the alleged errors to determine if they were so harmless that the verdict would be the same beyond a reasonable doubt. The issue of guilt and innocence is not even close in this case. Appellant admitted killing Logan, but claimed it was an accident. The jury found otherwise beyond a reasonable doubt. The gravity of the crime requires close examination of any alleged errors, but appellant's admission under oath that he killed Logan, outweighs any alleged error. Further the condition of Logan

---

[1]NRS 50.115(2) reads: "Cross-examination is limited to the subject matter of the direct examination and matters affecting the credibility of the witness, unless the judge in the exercise of discretion permits inquiry into additional matters as if on direct examination."

[2]The bullet entered below the right ear and exited above the left eye. An expended bullet was discovered under her head where her body was found on the floor. An expert witness testified that the entry wound to Logan's head indicated the muzzle of the weapon was next to her skin when fired. There was also testimony that the exit wound was made while her head was in contact with a solid object.

before the killing made it unlikely that she would have struggled with appellant, and finally the testimony of experts indicates Logan was killed "execution style." "[The] evidence against [appellant was] substantial enough to convict him in an otherwise fair trial, and . . . [t]he verdict would have been the same in the absence of [any alleged] error." Homick v. State, 112 Nev. 304, 316, 913 P.2d 1280, 1288 (1996).[3] "Appellant is not entitled to a perfect trial, but only to a fair trial, which he received." Ennis v. State, 91 Nev. 530, 533, 539 P.2d 114, 115 (1975) (citing Michigan v. Tucker, 417 U.S. 433, 446 (1974)). The conviction and sentence by the jury should be affirmed.

---

[3]Other alleged errors by the trial judge concerning rulings on evidence are without merit and will not be considered here.