OPINION
 

 Per Curiam:
 

 The State charged appellant Sebastian Stephanus Bridges with the October 26, 1997, murder of Hunter Blatchford, and with related offenses. The State sought the death penalty for the murder. Bridges represented himself at trial pursuant to his own request, after the district court found him competent to proceed and capable of representing himself.
 

 Bridges was subsequently convicted of: (1) first degree kidnapping (of Blatchford) with the use of a deadly weapon; (2) second degree kidnapping (of Bridges’ wife, Laurie) with the use of a deadly weapon; (3) battery (of Laurie) with the use of a deadly weapon; and (4) murder with the use of a deadly weapon. After the penalty hearing, the jury sentenced Bridges to death for the murder, finding one aggravating circumstance: that the murder was committed during a kidnapping or attempted kidnapping with the use of a deadly weapon. The district court sentenced Bridges to terms of imprisonment for the other offenses. The district court entered the judgment of conviction on July 24, 1998.
 

 This appeal followed. We affirm Bridges’ conviction and sentence of death.
 

 
 *756
 

 FACTUAL SUMMARY
 

 Guilt phase evidence
 

 Laurie Bridges (“Laurie”), Bridges’ wife, testified to events leading up to the murder of Hunter Blatchford. Laurie and Bridges were living together in California prior to May of 1997, when Laurie decided to leave Bridges and go to Las Vegas. She did not tell Bridges that she was leaving or where she was going.
 

 While in Las Vegas, Laurie became involved in a serious relationship with Hunter Blatchford.
 
 [1]
 
 Laurie avoided contact with Bridges out of fear; Bridges had threatened that if he ever found out that she was with another man, he would kill both Laurie and the other man.
 

 Bridges eventually tracked Laurie down. On October 21, 1997, he confronted her at the residence she shared with Blatchford. Bridges had a gun, and he told Laurie that he had tried to kill himself but could not do it. During an emotional discussion, Bridges gave the gun to Laurie and suggested that she kill him; Laurie refused. Ultimately, Bridges asked Laurie to drive him to the apartment where he was staying, and she agreed.
 

 At his apartment, Bridges pleaded with Laurie to give him another chance. Bridges then asked if they could at least be friends, and he gave Laurie his phone number. Subsequently, Bridges asked Laurie to drive him back to his car, which he had left near her residence.
 

 In Laurie’s truck, Bridges handed her a key that fit the ignition. Bridges said, “[J]ust remember wherever you go, whatever you do for the rest of your life I’ll know where you are and what you’re doing, and you can never get away from me.” Bridges told Laurie that he had been secretly watching her and Blatchford for the last three weeks and that he knew their schedules.
 

 Later that day, Laurie told Blatchford of her encounter with Bridges. Using the phone number that Bridges had given to Laurie, Blatchford called Bridges and spoke with him on at least two occasions. Blatchford and Bridges agreed to meet, together with Laurie, at Bridges’ apartment. According to Laurie, the purpose of the meeting was “to bring closure to the whole thing ... so that everybody would know where they stood and what was what and end it.”
 

 At approximately 5:00 p.m. on October 26, the trio met at Bridges’ apartment. They discussed why Laurie had left, and they discussed an offer by Bridges to buy Blatchford a new truck if Blatchford would allow Laurie to return and live with Bridges for two months. Blatchford refused. Additionally, Bridges offered
 
 *757
 
 Laurie $50,000 in cash that he claimed was her share of a business that he had liquidated.
 

 Bridges ultimately informed the couple that he was leaving the next day, but that he had some of Laurie’s belongings and other household items in storage. Laurie and Blatchford agreed to go with Bridges, in his car, to the supposed storage site. At that time, Laurie observed that Bridges was upset but that he did not seem threatening, and it appeared that he was going to accept the situation.
 

 Bridges drove to a remote location where several trailers were sitting. It was getting dark by this time. The trio got out of the car, and Bridges directed Blatchford and Laurie to one of the trailers that Bridges claimed had his name on it. Bridges indicated that he would give them the key to the trailer, which he had left at his car, so all three returned to the car.
 

 After Blatchford and Laurie got into the car, Bridges reached down near the driver’s seat and pulled out a gun. The child safety locks in the car were engaged, so Laurie and Blatchford could not get out of the car. Bridges ‘ ‘turned very angry in his face and he said, now we’re really gonna talk, now we’re really gonna talk,” and he pointed the gun at Blatchford. Blatchford responded, “[Y]ou’re gonna kill me now, aren’t you? I trusted you. I trusted you, man, we were gonna talk.’ ’ Then, Bridges fired one shot at Blatchford, hitting him in the abdominal region. Bridges told Laurie that it was her fault that a man had to die because of what she had done. Blatchford groaned and fell unconscious shortly after the shooting. Bridges began beating Blatchford over the head with the gun. Laurie put her hand up to stop Bridges from hitting Blatchford, and he struck her three times with the gun: once on each side of the head and once on the hand.
 

 Bridges handcuffed Blatchford and Laurie, and he placed cuffs on Laurie’s legs.
 
 [2]
 
 Bridges used garbage bags to cover Blatchford’s body; he told Laurie that he did not want police to see the body. Afterwards, he drove with Laurie toward California.
 

 Bridges exited the freeway at Nipton Road and stopped the car. He removed Laurie’s leg-cuffs. Using a shovel taken from the trunk of his car, Bridges dug a grave for Blatchford. Before placing the body in the grave, Bridges removed the handcuffs and garbage bags from the body. Bridges also decided to remove Blatchford’s clothes, apparently to expedite the decomposition process. He then covered Blatchford’s body with dirt and rocks. Before they left the site, Bridges removed Laurie’s handcuffs.
 

 Bridges and Laurie left the gravesite, and Bridges drove back
 
 *758
 
 toward Las Vegas. Bridges told Laurie that she must never tell anyone what had happened and that, if she told, she would be implicated. Laurie responded that she would not tell, and she asked Bridges to let her go. He indicated that he did not trust her and that he would take her to his apartment to stay with him. At one point, Bridges asked Laurie whether it would make her happy if he shot himself or turned himself in.
 

 During the drive, Bridges began “fiddling” with the gun. Bridges indicated that the gun was jammed, and Laurie warned him that the gun might discharge if he tried to fix it while driving. Bridges pulled his car off the road and tried to fix the gun. Then, a policeman pulled up, exited his car, and approached Bridges’ car. Bridges gave the gun to Laurie, telling her to place it between her legs.
 

 Officer Kenneth M. Twiddy testified concerning the following events. At approximately 9:48 p.m., Twiddy observed Bridges’ car parked at the shoulder of the road. He stopped and approached Bridges to see if he needed assistance. Bridges told Twiddy that he had stopped so that a woman passenger could go to the bathroom. At one point during the conversation, Twiddy pointed his flashlight inside the car and observed Laurie, who was shaking and appeared frightened. Twiddy also observed what appeared to be blood on the passenger seat, console, door, and driver’s seat, and he observed ammunition on the floor of the car. Twiddy called for back-up, and he ordered Bridges to step out of the car and approach Twiddy’s police car.
 

 After Bridges had exited the car, and while Twiddy was speaking with him, Laurie emerged from the driver’s side and came toward Twiddy. Laurie yelled that Bridges had murdered her friend. Twiddy searched Bridges for weapons and found a pair of handcuffs in Bridges’ back pocket. In addition, Twiddy noticed blood on Bridges’ pants and shirt, and dirt on his hands, arms, and nails, and on his shoes.
 

 After back-up arrived, the investigation continued. Bridges waived his rights pursuant to Miranda
 
 [3]
 
 and spoke with police about what had happened. Bridges eventually admitted to shooting Blatchford, but he claimed that it was an accident. Bridges told police that he had wanted to take his wife and Blatchford to California so that they could see a priest. Bridges stated that, at gunpoint, he ordered Blatchford to place handcuffs on his wrists. According to Bridges, the gun accidentally discharged. Bridges admitted that he had buried the body in the desert.
 

 A search of the passenger compartment of Bridges’ car resulted in the discovery of several items, including: (1) a Colt .45 pistol and a holster; (2) .45 magazines and cartridges; (3) a pin used for
 
 *759
 
 assembling/disassembling the gun; (4) a bag containing two rolls of duct tape and a box of 42-gallon plastic trash bags (as well some of the ammunition noted above); (5) a bank bag containing $50,000 in cash; (6) two sets of handcuffs and a set of leg-cuffs; and (7) a plastic bag containing latex gloves, white nylon ropes, black nylon cords, a black shirt, a black stocking cap, a pair of black gloves, and a box of envelopes. A search of the trunk yielded several additional items, including: (1) a stun gun; (2) a shovel; and (3) a black plastic bag containing bloodstained clothing and a wallet belonging to Blatchford. Police obtained a positive match for Bridges’ fingerprints on the pistol, one of the magazines, the leg-cuffs, the lid of the trunk, and the rear driver’s side door.
 

 Blatchford’s body was exhumed. An autopsy revealed that Blatchford had sustained a single, close-range, non-contact gunshot that went through his left forearm and abdominal area, perforating the small intestine and cutting the internal iliac artery. As a result, Blatchford suffered internal hemorrhaging, causing his death at the earliest five minutes, and probably ten to fifteen minutes, after he was shot.
 

 Bridges did not testify at trial or call any witnesses. However, he argued that the shooting was accidental.
 

 Penalty phase
 

 During the penalty phase, the State produced evidence that Bridges had been involved in property crimes in California that resulted in charges and convictions for criminal offenses, including burglary. In one incident, Bridges stole property worth possibly more than $200,000. The State also presented victim impact testimony. Bridges did not present any witnesses.
 

 In closing argument, prosecutor David T. Wall reviewed the procedure for determining the penalty. Bridges then spoke:
 

 If what [the prosecutors say] is true, there’s only one equation, and I don’t think I have to even tell you what that is.
 

 I know I didn’t murder Hunter Blatchford. You’ve made a determination; it took you twenty-five minutes to determine my innocence versus my guilt. If you could make that determination in twenty-five minutes based on lies, then it shouldn’t even take your twenty-five minutes to come to a conclusion. There’s only one answer to the equation, and that is to execute me.
 

 Thank you.
 

 In rebuttal, prosecutor Gary L. Guymon remarked that Bridges had on several occasions invited the jury to take his life. Guymon discussed the circumstances of the crime and concluded by com-
 
 *760
 
 meriting that the law permitted imposition of the death penalty and that the death penalty was appropriate in this case.
 

 DISCUSSION
 

 Bridges is represented by counsel in this appeal. Bridges, through counsel, makes several arguments challenging his conviction and sentence.
 

 Bridges’ recross-examination of Laurie
 

 Bridges claims that the district court erroneously restricted his recross-examination of Laurie. The relevant facts surrounding the redirect and recross-examination are important to considering Bridges’ claim.
 

 On redirect, the State questioned Laurie about a letter that she had written to Bridges. According to the trial transcript, Laurie indicated that she wrote the letter before she “ever had a relationship outside of the person with whom—.” It appears from Bridges’ statements and from the subsequent discussion of Laurie’s testimony outside the presence of the jury that Laurie said “prison” rather than “person.”
 
 [4]
 
 The court indicated that any reference to Bridges’ incarceration was unclear, but that the court would be willing to give a cautionary instruction or permit Bridges to conduct further inquiry of Laurie. Ultimately, Bridges decided not to ask Laurie any further questions.
 

 However, Bridges subsequently changed his mind after the next witness began to testify. The court permitted Bridges to conduct a limited recross-examination “on the very limited area of the redirect” to explore what Laurie said about meeting Bridges “outside” of prison. During the recross-examination, Bridges elicited testimony that established that: (1) Laurie met him while he was a prison inmate and while Laurie was a peace officer/nurse at the prison; (2) Laurie became involved in a physical relationship with Bridges; and (3) it was against the law to have such a relationship.
 

 On appeal, Bridges claims that the district court erroneously precluded questioning as to: (1) whether Laurie breached a duty of trust when she became involved in a physical relationship with Bridges while she was working at the prison; and (2) whether Laurie also breached a duty of trust by having a relationship with another inmate.
 

 We conclude that the district court did not err in restricting questioning on these two points. Although the court did not per
 
 *761
 
 mit Bridges to ask Laurie specifically whether she breached a duty of trust, the court subsequently (as noted above) permitted him to elicit Laurie’s admission that it was against the law for her to have a relationship with an inmate. Inquiry as to whether Laurie had also acted improperly with another inmate would have clearly exceeded the permissible scope of the recross-examination. Given the marginal relevance of the inquiry, the court did not err in precluding further inquiry into this area.
 
 See
 
 NRS 50.115;
 
 see also
 
 NRS 48.015-,035.
 

 We reject Bridges’ argument that the district court was required to permit further questioning to show bias or emotional partiality of Laurie. The proposed questioning was of marginal relevance to the issue of Laurie’s veracity and would have provided little evidence of bias or a motive to fabricate. Further, although the district court’s discretion to limit cross-examination regarding potential bias is limited,
 
 [5]
 
 consistent with constitutional norms trial judges “retain wide latitude” to restrict such inquiry “based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness’ safety, or interrogation that is repetitive or only marginally relevant.” Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986);
 
 see also
 
 Davis v. Alaska, 415 U.S. 308, 316, 320 (1974); Bushnell v. State, 95 Nev. 570, 573, 599 P.2d 1038, 1040 (1979) (recognizing that inquiry into a witness’s possible bias or motive to testify could be restricted when the inquiry was “repetitive, irrelevant, vague, speculative, or designed merely to harass, annoy or humiliate the witness”).
 

 Alleged error at guilt phase not preserved for appeal
 

 Bridges raises three instances of alleged error that occurred during the guilt phase of his trial, but that he did not properly preserve for appeal by appropriate objection. Given that Bridges failed to timely object and preserve these issues for appeal, he is not entitled to relief absent plain or constitutional error.
 
 See
 
 Sterling v. State, 108 Nev. 391, 394, 834 P.2d 400, 402 (1992).
 

 First, Bridges complains that the district court erred in permitting an allegedly prejudicial reference to nationality in a letter written by him to Laurie prior to trial. Specifically, Bridges, who is from South Africa, objects to the following reference: “what
 
 *762
 
 two people share in a marriage should be sacred,
 
 something most Americans don’t know anything about.”
 

 [6]
 

 (Emphasis added.)
 

 Bridges concedes that he failed to make a timely objection to the reference. The district court repeatedly told Bridges that he was entitled to the redaction of potentially prejudicial references in the letter. Bridges ultimately refused, indicating that he wanted the jury to see the whole letter. In closing argument, the State specifically referred to certain passages, including the one quoted above, as reflecting Bridges’ attempt to manipulate Laurie.
 

 We conclude that Bridges has failed to demonstrate plain or constitutional error. Bridges made a tactical decision not to contest the letter so that it would be admitted in its entirety. Further, the letter (including the quoted reference) was relevant to Bridges’ motive for the offense, as it is strong evidence of Bridges’ jealousy and possessiveness. Additionally, it could reasonably be argued from the evidence that Bridges was attempting to manipulate or coerce his wife, the key State witness in this case. The State was free to comment on the evidence, including the letter, and invite the jury to draw such reasonable inferences.
 
 See
 
 Green v. State, 81 Nev. 173, 176, 400 P.2d 766, 767 (1965) (“The prosecutor had a right to comment upon the testimony and to ask the jury to draw inferences from the evidence, and has the right to state fully his views as to what the evidence shows.”).
 

 Second, Bridges argues that the jury instructions blurred the distinction between the elements of first degree murder (premeditation and deliberation) and malice aforethought. Bridges asserts that additional instruction was necessary. Specifically, Bridges challenges the constitutionality of jury instruction 19, which informed the jury of the elements of premeditation and deliberation. This instruction is virtually identical to the instruction given to the jury, and upheld on appeal, in Kazalyn v. State, 108 Nev. 67, 75-76, 825 P.2d 578, 583-84 (1992),
 
 prospectively modified in
 
 Byford v. State, 116 Nev. 215, 994 P.2d 700 (2000).
 

 In
 
 Byford,
 
 we recently reconsidered the
 
 Kazalyn
 
 instruction. While we did not conclude that use of the instruction was error, we concluded that further instruction on the issue of deliberation would be preferable in the future, and we set forth other instructions for future use.
 
 Byford,
 
 116 Nev. at 234-37, 994 P.2d at 713-15. We affirmed Byford’s conviction, concluding that the record contained sufficient evidence of both premeditation and deliberation.
 
 Id.
 
 at 233-34, 994 P2d at 712-13.
 

 
 *763
 
 Consistent with
 
 Byford,
 
 the jury instructions in the instant case do not constitute reversible error. Bridges was tried prior to our decision in
 
 Byford;
 
 consequently, additional instruction as articulated in that decision was not required. Moreover, the evidence of premeditation and deliberation in this case is overwhelming.
 

 Similarly, the evidence of first degree murder under a felony murder theory is overwhelming; consequently, there is a valid independent basis to uphold the jury’s verdict. The felony murder theory was also charged by the State and presented to the jury. The jury found Bridges guilty of the first degree kidnapping of Blatchford, which, as alleged in the information read to the jury, required proof that the kidnapping was for the purpose of committing murder. The jury’s finding of kidnapping suggests that the jury agreed that Bridges was guilty of first degree felony murder under the facts presented here.
 

 Third, Bridges claims that the State improperly commented on Bridges’ failure to testify. Again, Bridges failed to properly preserve this issue for review by making an appropriate objection. In the context of alleged prosecutorial misconduct that has not been preserved for review, only plain or “patently prejudicial” error will be considered.
 
 See
 
 Riker v. State, 111 Nev. 1316, 1328, 905 P.2d 706, 713 (1995).
 

 The allegedly improper comment occurred during Bridges’ closing argument:
 

 THE DEFENDANT: .... A lot of people would say I was trying to avoid an altercation, and he came across with his arm, he swung out and that’s when—
 

 MR. WALL: Judge, I’m going to object.
 
 This is testimony. If he would like to be sworn, he had the opportunity to do that.
 

 The court sustained the prosecutor’s objection to the extent that Bridges’ argument was not based on the evidence. Bridges asserts that the prosecutor’s remark was a direct comment on Bridges’ failure to testify. Bridges further claims that reversal is required even if this court construes the remark as an indirect comment on his failure to testify.
 

 If the remark is construed as a “direct” comment on Bridges’ failure to testify, it would violate Bridges’ constitutional right against self-incrimination.
 
 See
 
 Harkness v. State, 107 Nev. 800, 803, 820 P.2d 759, 761 (1991). Even if the remark was an “indirect” reference, it would be impermissible if “ ‘the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be comment on the
 
 *764
 
 defendant’s failure to testify.’ ”
 
 See id.
 
 (quoting United States v. Lyon, 397 F.2d 505, 509 (7th Cir. 1968)).
 

 The context of the prosecutor’s comment must be taken into account in determining whether a defendant should be afforded relief. “A prosecutor’s comments should be viewed in context, and ‘a criminal conviction is not to be lightly overturned on the basis of a prosecutor’s comments standing alone . . . .’” Knight v. State, 116 Nev. 140, 144-45, 993 P.2d 67, 71 (2000) (quoting United States v. Young, 470 U.S. 1, 11 (1985)). Indeed, where “the prosecutor’s reference to the defendant’s opportunity to testify is a fair response to a claim made by defendant or his counsel,” there is no constitutional violation. United States v. Robinson, 485 U.S. 25, 32 (1988).
 

 Here, the State did comment on Bridges’ “opportunity” to testify, however the State did not ask the jury to draw any impermissible inference or otherwise negatively comment on Bridges’ failure to testify. Rather, the State’s objection was directed at what the State perceived was an improper attempt by Bridges to testify in his closing argument. Further, prior to the prosecutor’s comment at issue, the court permitted Bridges to explain, over the State’s objection, why he did not testify. Since Bridges himself had already made an issue of his failure to testify, any prejudice from the State’s reference was substantially diminished.
 

 Accordingly, we conclude that Bridges has failed to demonstrate prejudicial error such that relief would be warranted, notwithstanding his failure to object. Although the prosecutor should have phrased his objection without referring to Bridges’ opportunity to testify, we conclude that the prosecutor’s comments in this case were not “patently prejudicial.”
 
 See Riker,
 
 111 Nev. at 1328, 905 P.2d at 713;
 
 see also
 
 Chapman v. California, 386 U.S. 18, 21-26 (1967) (applying harmless error analysis where prosecutor improperly commented on defendant’s failure to testify),
 
 cited in
 
 McNelton v. State, 111 Nev. 900, 904, 900 P.2d 934, 936 (1995).
 

 Sufficiency of the evidence
 

 Bridges claims that insufficient evidence supports his conviction for first degree kidnapping with the use of a deadly weapon and the jury’s finding of the kidnapping aggravating circumstance. When this court reviews the evidence supporting a jury’s verdict, the question is whether the jury, acting reasonably, could have been convinced of the defendant’s guilt beyond a reasonable doubt by the evidence it had a right to consider.
 
 See
 
 Wilkins v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980).
 

 
 *765
 
 Here, there is ample evidence to demonstrate that Bridges committed first degree kidnapping and the kidnapping aggravating circumstance. Laurie’s testimony shows that Bridges used a ruse to lure Blatchford to a remote location for the purpose of killing him and that Bridges actually killed Blatchford in the course of that kidnapping. The physical evidence, including the items found in Bridges’ car, supports this conclusion. A kidnapping does not require force or restraint and may be shown, for example, where the defendant willfully “inveigles, entices, decoys, abducts, . . . or carries away a person by any means whatsoever.” NRS 200.310.
 

 Jury instruction on statutory aggravating circumstance
 

 Bridges asserts that the jury was erroneously instructed, at the penalty phase, on the statutory aggravating circumstance. Jury instruction No. 11 indicated that Bridges was charged with a single aggravating circumstance: “The murder was committed while the person was engaged in the commission of or an attempt to commit Kidnapping with Use of a Deadly Weapon.” Bridges notes that the instruction omitted the requirement of
 
 first degree
 
 kidnapping, pursuant to NRS 200.033(4).
 
 [7]
 
 The special verdict form was consistent with the erroneous instruction. According to Bridges, the error was prejudicial because the jury could have believed that evidence of both the second degree kidnapping of Laurie and the first degree kidnapping of Blatchford could be considered as part of the statutory aggravating circumstance.
 

 We conclude that Bridges is not entitled to relief notwithstanding the erroneous instruction. “[T]he Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review . . . .” Clemons v. Mississippi, 494 U.S. 738, 741 (1990);
 
 see also
 
 Pertgen v. State, 110 Nev. 554, 563, 875 P.2d 361, 366 (1994).
 

 
 *766
 
 First, we emphasize that there is no doubt concerning the propriety of the jury’s finding of the aggravating circumstance, notwithstanding the erroneous instruction. Here, the jury had previously found Bridges guilty of the first degree kidnapping of Blatchford. Given the jury’s prior determination of first degree kidnapping and the fact that Blatchford was killed in the course of that kidnapping, there is no doubt that the kidnapping aggravating circumstance applied.
 

 Thus, the only question is whether the error in the instruction resulted in an erroneous weighing of the aggravating versus mitigating circumstances. Bridges claims that the erroneous instruction might have caused the jury to place greater weight on the aggravating circumstance than it might have otherwise done because the jury could have improperly considered the second degree kidnapping of Laurie as part of the aggravating circumstance.
 

 We reject Bridges’ argument and conclude that the jury’s weighing of the aggravating and mitigating circumstances could not have been tainted, under the unique circumstances of this case. As the State persuasively argued before the jury and on appeal, there is no compelling evidence in mitigation in this case. Thus, we are not persuaded that any error tainted the balancing process.
 

 To foreclose possible future litigation, however, we have elected to explicitly reweigh the aggravating and mitigating circumstances based upon our independent review of the trial record, and to detail our determination. Here, we must reweigh any mitigating circumstances versus the valid aggravating circumstance insofar as it is limited to
 
 first
 
 degree kidnapping.
 
 See Pertgen,
 
 110 Nev. at 563, 875 P.2d at 366 (“Reweighing involves disregarding the invalid aggravating circumstances and reweighing the remaining permissible aggravating and mitigating circumstances.”). None of the specific statutory mitigating circumstances apply.
 
 See
 
 NRS 200.035. Bridges had a significant prior criminal history, and he was thirty-four years old at the time of the offense.
 
 See
 
 NRS 200.035(1), (6). Bridges acted alone, and there was no compelling evidence presented at trial that he acted under duress or “extreme mental or emotional disturbance.”
 
 See
 
 NRS 200.035(2)-(5). Nor do we perceive any “other” non-statutory mitigating circumstance.
 
 See
 
 NRS 200.035(7). Accordingly, we conclude that there is no mitigating circumstance or circumstances sufficient to outweigh the single valid aggravating circumstance.
 

 State’s rebuttal closing argument during penalty phase
 

 Bridges claims that, in the rebuttal closing argument during the penalty phase, prosecutor Guymon improperly and repeatedly
 
 *767
 
 used terms such as “aggravating” and “aggravation” to refer to evidence that was not relevant to the statutory aggravating circumstance. According to Bridges, Guymon’s repeated references suggest that these references were not inadvertent.
 
 [8]
 
 Bridges argues that the references were misleading, given Guymon’s comparison of this evidence to the lack of mitigating evidence, his reference to the kidnapping aggravating circumstance, and asserted ambiguity in the jury instructions.
 

 Although Bridges did not object to Guymon’s references, it is essential that we carefully review his claim, given the serious impropriety alleged. NRS 177.055(2)(c) mandates that we consider whether the death penalty has been imposed “under the influence of passion, prejudice or any arbitrary factor.” Because the term “aggravating circumstance” is a term of art, misleading references to “aggravation” or “aggravating” could taint the jury’s weighing of the legitimate aggravating and mitigating circumstances, resulting in the arbitrary imposition of the death penalty. Further, this court has indicated greater flexibility in considering issues of prosecutorial misconduct that were not preserved for appeal where a defendant’s life is at stake. Emmons v. State, 107 Nev. 53, 61, 807 P.2d 718, 723 (1991).
 

 Although we strongly criticize prosecutor Guymon’s characterization of the evidence in terms of aggravation and aggravating,
 
 [9]
 
 we have carefully considered the issue and determine that the error was harmless under the unique facts and circumstances of this case. Three factors support our conclusion. First, the jury instructions reflected that only one aggravating circumstance was actually alleged, and the special verdict form itself only included one aggravating circumstance.
 
 [10]
 
 Second, in the State’s original
 
 *768
 
 closing remarks, prosecutor Wall had carefully guided the jury through the steps for determining the appropriate penalty, including the weighing of the alleged aggravating circumstance versus any mitigating circumstances. Prosecutor Wall explained that “there’s only one aggravating circumstance alleged,” that the murder occurred during a kidnapping. Third and finally, the weighing process could not have been tainted because there was little to weigh on the side of mitigation. As discussed above, the aggravating circumstance unequivocally outweighed any mitigating circumstances.
 

 Bridges’ failure to present evidence of personality disorder
 

 Bridges claims that the penalty determination was tainted because the jury did not hear evidence that he had narcissistic personality disorder. Further, Bridges asserts that the disorder itself precluded him from making a rational decision not to introduce this evidence. Three experts evaluated Bridges. All three found evidence of a narcissistic personality, although they all found him to be competent.
 
 [11]
 

 Bridges argues that the personality disorder was a mitigating factor, and that it was important that the jury be presented with all mitigating evidence. Bridges attempts to analogize his failure to present the potentially mitigating evidence to the situation where trial counsel does not present mitigating evidence because he or she is unaware of the evidence. In this regard, Bridges relies on Kirksey v. State, 112 Nev. 980, 923 P.2d 1102 (1996). In
 
 *769
 

 Kirksey,
 
 this court commented “that failure to adequately investigate the availability of mitigating evidence or to advise the defendant regarding its significance might undermine the defendant’s decision not to present mitigating evidence and thereby support a claim of ineffective assistance.”
 
 Id.
 
 at 996, 923 P.2d at 1112.
 

 Bridges’ attempt to analogize the instant matter to a case involving counsel is unpersuasive. Because Bridges represented himself, he cannot complain that his own representation constituted ineffective counsel.
 
 See
 
 Faretta v. California, 422 U.S. 806, 835 n.46 (1975). Nor has Bridges presented any persuasive argument that he should not have been permitted to represent himself. As noted above, three experts determined that Bridges was competent. Moreover, the trial court carefully canvassed Bridges pursuant to
 
 Faretta
 
 and admonished him concerning the dangers of self-representation. Accordingly, we are not persuaded that Bridges’ decision to represent himself and to waive his right to counsel was anything but a constitutionally valid, knowing, voluntary, and intelligent decision.
 
 See id.
 
 at 835-36.
 

 Further, the State persuasively argues that to find error here would undermine
 
 Faretta
 
 because it would suggest that a defendant with narcissistic personality disorder who is otherwise competent and capable of representing himself or herself could not do so in all circumstances. At oral argument, Bridges’ counsel conceded that they were unable to cite to any case law recognizing an exception to
 
 Faretta
 
 under the circumstances presented here. We decline Bridges’ invitation to carve out an exception to
 
 Faretta.
 
 We reaffirm our own prior decision that “a criminal defendant is entitled to represent himself in whatever manner he wishes, whether that be by introducing mitigating evidence, by not introducing mitigating evidence or even by actively seeking the death penalty.” Colwell v. State, 112 Nev. 807, 811, 919 P.2d 403 , 406 (1996).
 

 Whether the death penalty is excessive
 

 Finally, Bridges argues that the death penalty is excessive given the crime and the defendant. We disagree. Bridges’ wife, Laurie, left him several months before he tracked her down, confronted her, and eventually killed her lover. The evidence reflects that Bridges behaved in a calculated fashion, both in his extensive preparation for the killing and in the commission of the killing itself. The killing was not immediately preceded by a dispute or altercation. After shooting Blatchford, Bridges treated the dying man with extreme callousness. Indeed, he beat both Blatchford
 
 *770
 
 and Laurie with his gun after the shooting. He had a prior criminal history, although it apparently did not involve violent offenses. He placed blame on other individuals, including Laurie.
 

 Mandatory review
 

 NRS 177.055(2) requires this court to review every death sentence and consider in addition to any issues raised on appeal:
 

 (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
 

 (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
 

 (d) Whether the sentence of death is excessive, considering both the crime and the defendant.
 

 We have fully discussed issues pertinent to NRS 177.055(2)(b) and (d) in the context of Bridges’ claims. The only remaining issue is whether the death sentence was “imposed under the influence of passion, prejudice or any arbitrary factor.”
 
 See
 
 NRS 177.055(2)(c). Having reviewed the record, we conclude that it was not.
 

 In so ruling, we emphasize that prosecutor Wall carefully explained to the jury the requisite steps of the sentencing determination. Wall did not rely on Bridges’ failure to present mitigating evidence at the penalty phase but instead discussed each of the possible statutory mitigating circumstances and explained the reason for the State’s assertion that the circumstance was not present. Although prosecutor Guymon’s comments concerning “aggravation” and “aggravating” were inappropriate, we reiterate our conclusion that they did not taint the penalty determination under the unique facts and circumstances of this case.
 

 CONCLUSION
 

 We affirm Bridges’ conviction and sentence of death.
 

 [1]
 

 Laurie and Blatchford originally met as co-workers in 1996, while Laurie and Bridges were living in Las Vegas.
 

 [2]
 

 The State produced photographs taken after the incident that showed that Laurie sustained visible injuries to the head and that she had marks on her wrists consistent with handcuffing.
 

 [3]
 

 Miranda v. Arizona, 384 U.S. 436 (1966).
 

 [4]
 

 The State conceded, at oral argument, that the transcript likely contains an error in that Laurie did refer to “prison” during questioning.
 

 [5]
 

 See
 
 Jackson v. State, 104 Nev. 409, 412, 760 P.2d 131, 133 (1988); Bushnell v. State, 95 Nev. 570, 572-73, 599 P.2d 1038, 1039-40 (1979).
 

 [6]
 

 Because the letter itself is partially illegible, the quotation is taken from the State’s closing argument, wherein the State specifically quoted passages from the letter.
 

 [7]
 

 NRS 200.033(4) provides, in pertinent part, that it is an aggravating circumstance where:
 

 The murder was committed while the person was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit, any . . . kidnaping in the first degree, and the person charged:
 

 (a) Killed or attempted to kill the person murdered; or
 

 (b) Knew or had reason to know that life would be taken or lethal force used.
 

 [8]
 

 For example, Guymon commented, ‘ ‘Is there aggravation when the script writer to this somehow says, I’m going to take it upon myself now to bury this body and left the body interred in the ground, somehow denying the family of a decent burial . . . ?” Guymon further commented near the conclusion of the rebuttal, “The law permits you to send a message with this case that we, the jury, find that there is great aggravation in you, Mr. Bridges’s conduct, for your repeated criminal conduct, for your repeated placing the blame on someone else, for you . . . failing to take responsibility for your conduct; and for the very fact that there is an aggravator of first degree kidnapping with use of a deadly weapon . . . .”
 

 [9]
 

 We caution prosecutors to avoid references that might mislead the jury concerning the essential process for determining the appropriate penalty in a death penalty case. Although we elect not to sanction prosecutor Guymon in this case, we will not hesitate to impose sanctions in future cases involving similar conduct.
 

 [10]
 

 Jury instruction No. 11 provided:
 

 You are instructed that the following factors are circumstances by which Murder of the First Degree may be aggravated:
 

 
 *768
 
 1. The murder was committed while the person was engaged in the commission of or an attempt to commit Kidnapping With Use of a Deadly Weapon.
 

 Nevertheless, Bridges claims the instructions were ambiguous because they included references to “aggravating circumstances.” For example, the instructions further indicated that the jury had to find “at least one of the aggravating circumstances alleged” in order to consider the death penalty, and that the jury had to balance any mitigating circumstances against “one or more aggravating circumstances.” Bridges asserts that the jury should have been specifically instructed that kidnapping was the only aggravating circumstance to consider. We encourage the district courts and the parties to carefully tailor the jury instructions to the case at issue. However, we conclude that the jury could not have been misled by the instructions in the instant case.
 

 [11]
 

 Psychologist Lewis M. Etcoff indicated that Bridges felt superior to the human race and that Bridges believed that there was very little wrong with him. Etcoff explained that Bridges knew the difference between right and wrong but that he could not “easily conform to right and wrong because a narcissist places himself above the right and wrongs of society.” Psychiatrist Jack A. Jurasky stated that persons with the personality disorder might act impulsively or rashly, although they know the difference between right and wrong. Jurasky explained that Bridges was caught up in very powerful emotions. Finally, psychologist Marv A. Glovinsky stated that Bridges’ thinking pattern was “self-centered,” “grandiose,” and characterized by a sense of entitlement.